UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- :

BUILDERS GROUP LLC, d/b/a BUILDERS    :        **1:07-cv-5464 (DAB)**
GROUP TECHNOLOGIES,                    :
                                       :
                    Plaintiff,         :        **CIVIL ACTION**
                                       :
        -against-                      :
                                       :        **AFFIDAVIT OF ROBERT**
QWEST COMMUNICATIONS              :        **BACHMEIER IN SUPPORT OF**
CORPORATION,                           :        **MOTION TO STAY ACTION AND**
                                       :        **COMPEL ARBITRATION**
                    Defendant.         :
                                       :
------------------------------------------------------- :

STATE OF MICHIGAN          )
                           ) ss.
COUNTY OF WAYNE            )

      I, Robert Bachmeier, being of lawful age and first duly sworn upon oath, hereby state and

affirm that:

      1.      I am a former employee of Qwest Business Resources, Inc., an affiliate of

defendant, Qwest Communications Corporation ("Qwest").  At times relevant to this action,

beginning in 1998 and ending on January 1, 2007, I held the positions of Project Manager and

Senior Project Manager in the Finance-Real Estate department of Qwest.  I make this affidavit

based on personal knowledge, and I submit it in support of Qwest's application for an order

staying this action and compelling arbitration.

      2.      In or about 2005, I became aware of claims made by plaintiff, Builders Group

LLC, for payments of amounts allegedly owed to it by Qwest pertaining to certain construction

work Builders Group and its subcontractors had performed for Qwest in and around 2001 at a

telecommunications facility located at 60 Hudson Street, New York, New York.  ("the Hudson

Street project").  By the time plaintiff's claims were made, the Qwest Project Manager for the

Hudson Street project had left Qwest's employ.

3.      Among other things, plaintiff advanced the claim of underpayment by Qwest for the Hudson Street project in its defense of a lawsuit brought by one of its subcontractors on the project, entitled *Hugh O'Kane Electric Co., Inc. v. GJF Construction Corp. d/b/a Builders Group LLC, et als.,* Index No. 603933/03 (Supreme Court - New York County).  ("the *O'Kane* lawsuit").

4.      Qwest was served with a non-party subpoena in the *O'Kane* lawsuit, calling for the production of certain documents and deposition testimony.  I participated in the gathering of documents responsive to the subpoena and, on February 1, 2006, I gave a deposition under examination by attorneys for O'Kane and Builders Group.

5.      Among the documents produced by Qwest in the *O'Kane* lawsuit was Contract Order No. 008349 between Qwest and Builders Group, which set forth certain of the terms and conditions applicable to the Hudson Street project.

6.      A true and correct copy of Contract Order No. 008349 is attached to this affidavit as Exhibit A.

7.      Contract Order 008349, which was signed by Qwest's Director, Contracts and Procurement and Builders Group's Project Manager at page 2, in turn, expressly refers to and incorporates the Master Contract No. BZ980026 between Qwest and Builders Group, as follows:

> Effective November 15, 2000 Qwest Communications Corporation, ("Company") and Builders Group Technologies ("Contractor") hereby agree that Contractor shall perform the following Construction Work for Qwest pursuant to all terms and provisions under the terms of Master Construction Agreement No. BZ980026.

Exhibit A at page 1.

8.      Master Contract No. BZ980026 sets forth the general terms of the agreement between Qwest and Builders Group relative to the Hudson Street project.  Among many other

- 2 -

things, it provides in Section 43 at pages 38 and 39 for arbitration of claims such as those brought by Builders Group in this lawsuit.

9.     A true and correct copy of Master Contract No. BZ980026, effective June 25, 1998 and set up for signature by a Qwest Senior Vice President and the President of Builders Group but without their signatures, is attached to this affidavit as Exhibit B.

10.     A true and correct copy of the Amendment to the Master Construction Agreement, also effective as of June 25, 1998 and set for signature by the same two representatives of Qwest and Builders Group, but also unsigned, is attached to this Affidavit as Exhibit C.

11.     Qwest has made a diligent search of its records but has been unable to date to locate a signed copies of Master Contract No. BZ980026 or the Amendment to the Master Construction Agreement.

12.     Upon information and belief, both Qwest and Builders Group executed Master Contract No. BZ980026 and the Amendment to the Master Construction Agreement before the Hudson Street project was commenced.  Certainly, the parties agreed that "all terms and provisions" of Master Contract BZ980026 applied to the Hudson Street project, as stated in Contract Order 008349, which was signed by both parties.  See attached Exhibit A at page 2.

Sworn to me before this
22 day of August 2007

Notary Public

CATHERINE L. EMERLING
Notary Public, State of Michigan
County of Wayne
My Commission Expires Mar. 16, 2013
Acting in the County of _Wayne_

- 3 -

# EXHIBIT A



# CONTRACT ORDER NO. 008349
## PROJECT NO. 20132.15953.33019

Effective November 15, 2000 Qwest Communications Corporation, ("Company") and Builders Group Technologies ("Contractor") hereby agree that Contractor shall perform the following Construction Work for Qwest pursuant to all terms and provisions under the terms of Master Construction Agreement No. BZ 980026.

### Part 2: Construction - (60 Hudson, New York, NY)

**Description of Construction Work:** Connect to the new electrical service from the new power vault to the existing power risers and required switchgear, all in accordance with the attached Scope of Work. (Attachment No.1).

**Guaranteed Maximum Price:** $ 1,352,253.00 (inclusive of Contractors Fee at 10 % - see Attachment No.2 for price breakdown).

**Location of Project:** 60 Hudson -- New York, NY.

**100% Performance and Payment Bond required :** Yes ☐,, No ☒,

**Liquidated Damages:** Yes ☒, No ☐, Amount: $5,000.00/day

**Start of Construction:** November 15, 2000

**Substantial Completion Date:** December 15, 2000

**Specifications:** Incorporated by reference and attached hereto are the following documents:

- Attachment No. 1 -        Scope of Work
- Attachment No. 2 -        Price Breakdown of GMP
- Attachment No. 3 -        Schedule
- Attachment No. 4 -        Contractor Allowances and Clarifications
- Attachment No. 5 -        Qwest Planning and Design Criteria Manual (6/12/00) (already in your possession)
- Attachment No. 6 -        Communications and Invoicing Instructions
- Attachment No. 7 -        Submittal Requirements

**Qwest 0017**



# CONTRACT ORDER NO. 008349
### PROJECT NO. 20132.15953.33019

## THIS PAGE INTENTIONALLY LEFT BLANK

**Qwest Representative:**     Erik Bradford

**APPROVED AND ACCEPTED:**

| Qwest Communications Corp. | | Builders Group Technologies | |
|---|---|---|---|
| Company | | Contractor | |
| By _T.Reilly_ | | By _[signature]_ | |
| Thomas T. Reilly | 1/2/01 | James Maniscalo | |
| Director, Contracts & Procurement | | Project Manager | |
| Name/Title | Date | Name/Title | Date |

i:\contracts\reseller_contracts\d_batch\builders\orders\0083-49.doc

01/18/2006   10:00AM

# EXHIBIT B

Master Contract No. BZ980026

# TABLE OF CONTENTS

**Page**

1. The Request For Proposal Process.................................................................... 1

2. Contractor's Representations ......................................................................... 3

3. Qwest's Representations ............................................................................... 3

4. Contract Documents ..................................................................................... 4

5. Correlation and Intent ................................................................................. 4

6. Ownership of Documents .............................................................................. 5

7. Qwest's Duties ........................................................................................... 5

8. Contractor's Design Services ........................................................................ 6

9. Contractor's Construction Work..................................................................... 7

10. Contractor's Review Of Job Site Conditions................................................... 8

11. Contractor's Personnel ............................................................................... 8

12. Award Of Construction Work Subcontracts .................................................... 9

13. Qwest's Right To Perform And To Award Separate Contracts...................... 10

14. Qwest's Representative............................................................................. 10

15. Inspection, Testing, and Quality Control ..................................................... 11

16. Warranty ............................................................................................... 12

17. Material and Equipment Substitutions ........................................................ 13

18. Cost Of The Construction Work And GMP ................................................... 14

19. Contractor's Fee ..................................................................................... 14

20. Cost Of The Construction Work ................................................................. 15

21. Applications For Payment ......................................................................... 17

22. Right To Offset........................................................................................ 18

23. Change Orders ........................................................................................ 18

24. Time....................................................................................................... 19

25. Excusable Delays..................................................................................... 20

26. Claims.................................................................................................... 21

27. Liquidated Damages................................................................................. 22

28. Lien Waivers ........................................................................................... 22

29. Care, Custody, Control, And Title To Materials And Equipment.................... 22

30. Royalties and Patents ............................................................................... 23

31. Suspension of Work.................................................................................. 23

32. Termination For Cause.............................................................................. 24

Master Contract No. BZ980026

## TABLE OF CONTENTS

**Page**

33. Termination For Convenience ................................................................. 26

34. Indemnity .................................................................................................. 29

35. Insurance .................................................................................................. 30

36. Performance and Payment Bonds............................................................ 31

37. Safety ........................................................................................................ 32

38. Cleanup And Disposal Of Waste ............................................................. 34

39. Notices ...................................................................................................... 35

40. Notice of Substantial Completion............................................................ 35

41. Final Completion and Final Payment ...................................................... 36

42. Partial Occupancy or Use ........................................................................ 37

43. Arbitration................................................................................................ 38

44. Term .......................................................................................................... 39

45. Entire Agreement; Amendments ............................................................. 40

46. Governing Law ......................................................................................... 40

47. Separability .............................................................................................. 40

48. Waivers ..................................................................................................... 40

49. References To Paragraphs Or Subparagraphs, Exhibits, Schedules And
     Contract Orders...................................................................................... 40

50. Counterparts ............................................................................................ 40

51. Headings ................................................................................................... 40

52. Agreement Not Construed Against Draftsman......................................... 40

53. Assignment................................................................................................ 41

54. Compliance With Laws ............................................................................ 41

55. Immigration .............................................................................................. 41

56. Nondiscrimination .................................................................................... 41

57. Labor Relations ........................................................................................ 41

58. Prohibited Relationships And Gratuities.................................................. 42

59. No Contractual Relationship .................................................................... 42

60. Confidentiality.......................................................................................... 42

61. Use Of Qwest's Name.............................................................................. 44

Master Contract No. BZ980026

## TABLE OF CONTENTS

**Page**

Glossary of Terms ........................................................................... 46

## Master Construction Agreement

THIS MASTER CONSTRUCTION AGREEMENT ("Master Agreement"), to be used with subsequently executed individually numbered agreements ("Contract Orders"), is entered into by and between QWEST COMMUNICATIONS CORPORATION, a Delaware corporation ("Qwest"), and BUILDERS GROUP ("Contractor"), effective as of June 25, 1998 (the "Effective Date").

### Glossary of Terms

Capitalized terms used herein shall have the meanings ascribed to them where first used or, if not defined where first used, in the Glossary of Terms, attached hereto.

### Background

A.      Qwest is in the business, among other things, of constructing, owning and operating fiber optic communications networks.

B.      Contractor is in the business, among other things, of designing and constructing facilities for fiber optic communications networks.

C.      Qwest desires from time to time to retain Contractor to perform Design Services and Construction Work as more specifically described in Contract Orders.

D.      Contractor desires to undertake performance of the Design Services and Construction Work, subject always to the terms and conditions of this Master Agreement and the related Contract Order.

Now, therefore, the Parties, mutually intending to be bound, agree as follows:

### Agreements

**1.    The Request For Proposal Process.**

(a)      During the term of this Master Agreement, Contractor will be available to respond to Part 1 and Part 2 of Qwest's Request(s) for Proposals ("RFP(s)") to perform Design Services and Construction Work associated with particular Contract Orders.

(b)      Contractor will furnish its lump-sum fixed price proposal to perform the Design Services associated with a particular Contract Order in its response to Part 1 of Qwest's Request for Proposal ("RFP").  Contractor's proposal shall constitute an offer by Contractor to perform the Design Services on the terms set forth in this Master Agreement, Part 1 of the RFP, and Part 1 of the Contract Order.  Such offer will be held open by Contractor for thirty (30) Days.  Part 1 of Qwest's RFP shall

include a description of the Design Services required ("Deliverables"), the location of the Project, the amount of time available for completion of the Design Services, and any other matters which Qwest determines to be material to the performance of the Design Services.

(c)    If Contractor's Part 1 proposal is accepted by Qwest, Contractor and Qwest will execute Part 1 of the Contract Order and Contractor shall forthwith begin performance of the Design Services. Deliverables, at a minimum, will consist of: (1) Drawings and Specifications; (2) an estimate of the Cost of the Construction Work; (3) a Construction Schedule; and, (4) an estimated Guaranteed Maximum Price ("GMP") for the Construction Work.

(d)    Following completion of the Design Services pursuant to Part 1 of the Contract Order, Contractor will submit its Part 2 proposal to perform the Construction Work in response to Part 2 of Qwest's RFP. Contractor's proposal in response to Part 2 of Qwest's RFP shall constitute an offer by Contractor to perform the Construction Work on the terms set forth in this Master Agreement, Part 2 of Qwest's RFP, and Part 2 of the Contract Order. Such offer shall be held open by Contractor for thirty (30) Days. Contractor's Part 2 proposal shall include, at a minimum, Contractor's estimate of the time to complete the Construction Work ("Contract Time"), Contractor's estimate of the Cost of the Construction Work, and Contractor's estimated GMP.

(e)    Following negotiation of the above referenced estimates to firm commitments, Qwest may accept Contractor's proposal in response to Part 2 of Qwest's RFP. If Contractor's Part 2 proposal is accepted by Qwest, Contractor and Qwest will execute Part 2 of the Contract Order and Contractor shall forthwith begin performance of the Construction Work.

(f)    This Master Agreement is nonexclusive. Qwest shall be under no obligation to engage Contractor to perform all or any part of the Design Services or Construction Work, or to reimburse Contractor for costs associated with its preparing a proposal in response to the either Part 1 or Part 2 of Qwest's RFP. Qwest may accept Contractor's Design Services proposal in response to Part 1 of Qwest's RFP, but use another contractor to perform the Construction Work required by Part 2 of Qwest's RFP.

(g)    All Design Services will be performed for a lump-sum fixed price. Contractor shall be paid for Design Services in a manner agreed to at the time of execution of Part 1 of the Contract Order. All Construction Work will be performed on the basis of the Cost of the Construction Work, plus Contractor's Fee stipulated herein, with a GMP. Contractor shall be paid for Construction Work on a monthly basis following its submission of an application for payment.

(h)    Contractor is an independent party engaged by Qwest on an as needed basis. Nothing contained herein shall be construed to indicate that Contractor and Qwest have other than an independent contractor relationship.

2.    CONTRACTOR'S REPRESENTATIONS.  Contractor represents to Qwest as follows:

(a)    Contractor is a corporation duly organized, validly existing and in good standing under the Laws of its place of incorporation and the execution, delivery, and performance of this Master Agreement, and related Contract Orders, on the part of Contractor, have been, or will be, duly authorized by all requisite corporate actions;

(b)    Contractor is not in violation of any Law which violation, individually or in the aggregate, would materially and adversely affect Contractor's performance and its obligations under this Master Agreement, and related Contract Orders;

(c)    Contractor will be qualified to do business in all jurisdictions in which such qualification is required in connection with its performance of Design Services or Construction Work;

(d)    Contractor is not a party to any legal, administrative, arbitrable, investigatory, or other proceeding or controversy pending, or, to the best of Contractor's knowledge, threatened, that would materially and adversely affect Contractor's ability to perform its obligations under this Master Agreement, or related Contract Orders;

(e)    This Master Agreement, and any Contract Orders subsequently executed, are duly executed and delivered and constitute legal, valid, and binding obligations of Contractor enforceable against Contractor in accordance with their terms;

(f)    Contractor is knowledgeable and experienced in designing, or causing to be designed, and constructing the type of projects that will be required by the Contract Orders executed pursuant to this Master Agreement, and the Design Services and Construction Work will be completed in accordance with this Master Agreement and the particular Contract Order, and will be fit for its intended purpose; and

(g)    Contractor has an adequate staff of properly trained, licensed, and qualified personnel for the performance of the obligations to be undertaken by Contractor.

3.    QWEST'S REPRESENTATIONS.  Qwest represents to Contractor as follows:

(a)    Qwest is a corporation duly organized, validly existing and in good standing under the Laws of Delaware and the execution, delivery, and performance of this Master Agreement have been duly authorized on the part of Qwest by all requisite corporate action;

(b)    Qwest is not in violation of any Law which violation, individually or in the aggregate, would materially and adversely affect Qwest's performance of its obligations under this Master Agreement;

(c)    Qwest will be qualified to do business in all jurisdictions in which qualification will be required in connection with the execution of Contract Orders;

**Master Contract No. BZ980026**

(d)    Qwest is not a party to any legal, administrative, arbitrable, investigatory or other proceeding or controversy pending, or, to the best of Qwest's knowledge, threatened, that would materially adversely affect Qwest's ability to perform its obligations under this Master Agreement or subsequently issued Contract Orders; and

(e)    This Master Agreement, and subsequently executed Contract Orders, are duly executed and delivered and constitute legal, valid, and binding obligations of Qwest enforceable against Qwest in accordance with their terms.

**4.    CONTRACT DOCUMENTS.**  The Contract Documents shall consist of the following:

(a)    This Master Agreement;

(b)    Any exhibits, Change Orders, or amendments to the Master Agreement or any Contract Order; and

(c)    All Specifications and Drawings.

The above listed Contract Documents shall comprise and represent the entire and integrated contractual agreement between the Parties, and shall supersede all prior or contemporaneous negotiations, representations, and agreements, either oral or written.  This Master Agreement shall remain in effect as to all Contract Orders referring hereto except to the extent specifically modified by the terms of any Contract Order or modified by a written instrument executed by both Parties.

**5.    CORRELATION AND INTENT.**

(a)    The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Design Services and Construction Work by Contractor .  The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by Contractor shall be required to the extent consistent with the Contract Documents and inferable from them as being necessary to produce the intended results.

(b)    Unless otherwise stated in the Contract Documents, words which have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

(c)    All Designed Services and Construction Work mentioned or indicated in the Contract Documents shall be performed by Contractor as part of this Master Agreement unless it is specifically indicated in the Contract Documents that such Design Services and Construction Work is to be performed by Qwest or separate contractors.

(d)    In the event of any conflict(s) among the Contract Documents, the precedences in resolving such conflict(s) shall be as follows:

Master Contract No. BZ980026

(d)    Qwest shall assume responsibility for damage, utilities, safety and security for any portion of the job site it occupies for its intended use prior to Substantial Completion.

## 43.    ARBITRATION.

(a)    All claims, disputes and other matters in question between Contractor and Qwest arising out of, or relating to this Master Agreement, any Contract Order, the Project, the Design Services, the Construction Work, the Contract Documents or the breach thereof may, at Qwest's sole option, and only upon the exercise of that sole option by Qwest, together or separately as Qwest sees fit, be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining as modified hereby.

(b)    Any arbitration arising out of or relating to this Master Agreement, the Contract Order, the Project, the Design Services, the Construction Work, the Contract Documents, or the breach thereof may include by consolidation, joinder or in any other manner, at Qwest's sole option, any other entities or persons whom Qwest believes to be substantially involved in a common question of fact or Law. If more than one claim, dispute, or other matter in question, shall be in existence at the same time, Qwest may at its sole option decide which of such claims, disputes or other matters in question shall be arbitrated and which shall not be arbitrated. Such decision shall be final and unappealable, and no arbitration shall be authorized to consider, decide, or make any award on any claim or matter which Qwest has determined shall not be arbitrated.

(c)    In the event that Contractor wishes to request arbitration of any claim, dispute or other matter in question, Contractor shall file a notice of demand for arbitration in writing with Qwest specifically describing the claims, disputes and other matters in question which Contractor wishes to submit to arbitration. Contractor may not unilaterally elect arbitration or cause arbitration to occur. Qwest has the sole discretion to decide whether or not any such claims, disputes, and other matters shall be submitted for arbitration. If Qwest wishes to submit any claim, dispute or other matter in question, whether or not it is the subject of a request for arbitration by Contractor, Qwest shall file a notice of demand for arbitration with the American Arbitration Association and with Contractor.

(d)    Qwest shall have the right, but not the obligation, by so electing in its arbitration demand, to invoke the following method of selection of arbitrators in lieu of that otherwise provided by the American Arbitration Association rules. If Qwest so elects in its notice of demand for arbitration, Qwest may appoint one (1) arbitrator in its notice of demand for arbitration. If Qwest does so, Contractor may, within ten (10) Days, appoint a second arbitrator. These two (2) arbitrators shall, within thirty (30) Days, or such further time as may be agreed upon between Qwest and Contractor, appoint a third arbitrator. If the two (2) arbitrators fail to appoint a third arbitrator, the third arbitrator shall be appointed in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association.

(e)     Qwest may elect, in its notice of demand for arbitration, to have the discovery rights and procedures provided by the Federal Rules of Civil Procedure or Colorado Rules of Civil Procedure to be available and enforceable within the arbitration proceeding.  The Parties shall be entitled to the full scope of and procedure for discovery, as defined by the broadest of the Federal or Colorado Rules of Civil Procedure.  The arbitrators shall have the full powers and functions of a federal district judge with respect to such discovery to the extent permitted by law. In addition, the Parties may apply to any court or courts of competent jurisdiction in the aid of and in enforcement of such rights of discovery.

(f)     In any case in which Qwest elects to submit a claim, dispute, or other matter in question to arbitration as provided herein, Qwest shall, in its sole discretion, select the location for the arbitration.  Any request or demand for arbitration hereunder shall be made before the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

(g)     This agreement to arbitrate shall be specifically enforceable by Qwest under the prevailing arbitration Law.  Any award rendered by arbitrators shall be final and enforceable by any Party to the arbitration, and judgment may be rendered upon it in accordance with applicable Law in any court having jurisdiction thereof.  The prevailing Party shall be entitled to recover its reasonable attorneys fees and all expenses arising out of the arbitration process.

(h)     Contractor and Qwest mutually agree to arbitrate under the terms and conditions outlined in this Paragraph.  Notwithstanding Qwest's right and discretion not to do so, Qwest shall arbitrate, after Final Completion of the Construction Work, any claims which Contractor selects which total, in the aggregate, up to five thousand dollars ($5,000).  Qwest's obligation to arbitrate such claims totaling up to five thousand dollars ($5,000) shall be specifically enforceable by Contractor under the prevailing arbitration Law and any award rendered by the arbitrator(s) shall be final and enforceable by any Party to the arbitration, and judgment may be rendered upon it in accordance with applicable Law in any court having jurisdiction thereof.

(i)     Unless otherwise agreed in writing, and notwithstanding any other rights or obligations of either of the Parties under the Contract Documents, Contractor shall carry on with the performance of its services and duties hereunder during the pendency of any claim, dispute, other matter in question or arbitration or other proceeding to resolve any claim, dispute or other matter in question, and Qwest shall continue to make payments in accordance with the Contract Documents, but Qwest shall be under no obligation to make payments on or against such claims, disputes, or other matters in question, during the pendency of any arbitration or other proceeding to resolve such claims, disputes or other matters in question.

**44.     TERM.**  The term of this Master Agreement shall be coextensive with each subsequently executed Contract Order entered into pursuant to this Master Agreement.  Either Party to the Master Agreement may terminate the Master Agreement by notice to the other if no Design Services or Construction Work remains uncompleted pursuant to a previously executed Contract Order.  However, each

Party's obligations in the Master Agreement or any Contract Orders shall survive such termination.

**45.    ENTIRE AGREEMENT; AMENDMENTS.** This Master Agreement and related Contract Orders embody the entire agreement between the Parties hereto with respect to the subject matter and supersedes all prior and contemporaneous agreements and understandings, oral and written, with respect thereto. This Master Agreement and any related Contract Orders may be amended only by a written instrument signed by the Party against whom any waiver, change, amendment, modification or discharge may be sought.

**46.    GOVERNING LAW.** This Master Agreement and related Contract Orders shall be governed by and construed in accordance with Laws of the State of Colorado, without regard to the conflict of Laws principles of Colorado.

**47.    SEPARABILITY.** Any term or provision of this Master Agreement or related Contract Orders which are found by any court or arbitrator to be invalid or unenforceable will be ineffective only to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Master Agreement or any related Contract Order.

**48.    WAIVERS.** No failure or delay on the part of either Party to this Master Agreement and related Contract Orders in exercising any power, right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.

**49.    REFERENCES TO PARAGRAPHS OR SUBPARAGRAPHS, EXHIBITS, AND CONTRACT ORDERS.** All references in this Master Agreement or Contract Orders to a Paragraph or Subparagraph are to the Paragraphs or Subparagraphs of this Master Agreement or subsequently executed Contract Orders. All references in this Master Agreement to an exhibit, or Contract Order are to the exhibits, and Contract Orders incorporated herein by such reference.

**50.    COUNTERPARTS.** This Master Agreement may be executed in any number of counterparts which, taken together, shall be but one and the same instrument.

**51.    HEADINGS.** The headings in this Master Agreement are for purposes of reference only and shall not limit, enlarge or otherwise affect any term or provision of this Master Agreement.

**52.    AGREEMENT NOT CONSTRUED AGAINST DRAFTSMAN.** The Parties and their respective counsel have reviewed this Master Agreement in its entirety and acknowledge that each has had a full opportunity to negotiate the terms of this Master Agreement. Therefore, the Parties waive any and all applicable common Law and statutory rules of construction that any provision of this Master Agreement should be construed against the drafter of the Master Agreement. The Master Agreement and all provisions thereof, including related Contract Orders, shall in all cases be construed as a whole, according to the fair meaning of the language used.

Master Contract No. BZ980026

**61.    USE OF QWEST'S NAME.** Contractor will submit to Qwest all advertising, sales promotions and other publicity matters relating to the Work wherein Qwest's name is mentioned or language is used from which a connection of Qwest's name therein may, in Qwest's judgment, be inferred or implied; and Contractor shall neither publish or use such advertising, sales promotion, or publicity matter nor use Qwest's name as a reference without the prior consent of Qwest. This provision shall appear in any and all of Contractor's Subcontracts.

EFFECTIVE as of the Effective Date.

QWEST COMMUNICATIONS CORPORATION

CONTRACTOR:  BUILDERS GROUP

By: _____
Name: __August B. Turturro____
Title: __Senior Vice President____
Date of Signature: _____

By: _____
Name: ___George Figliolia_____
Title: _____President_____
Date of Signature: _____

DENVER:0832250.11

Master Contract No. BZ980026

### GLOSSARY OF TERMS

**BUSINESS DAY** shall mean any calendar day other than a Saturday, Sunday, or any other calendar day on which commercial banks are authorized or required to close in Denver, Colorado.

**CHANGE ORDER** shall mean a written order to Contractor pursuant to Paragraph 23 hereof, signed by Qwest and Contractor authorizing an addition, deletion, or revision in the Design Services or Construction Work, the Contract Time, or any change to the Guaranteed Maximum Price resulting therefrom.

**CONTRACT DOCUMENTS** shall mean the documents, including written modifications thereto, as defined in Paragraph 4.

**CONTRACT ORDER** shall mean a Contract Document executed subsequent to the Master Agreement that delineates the Design Services in Part 1 and the Construction Work in Part 2, and conditions that apply thereto on a Project.

**CONTRACT TIME** shall mean that period of time allotted in the Contract Order for Substantial Completion of the Construction Work.

**CONTRACTOR'S FEE** shall have the meaning stipulated in Paragraph 19.

**CONSTRUCTION SCHEDULE** shall mean the projected schedule for the performance of the Construction Work on the relevant Contract Order.

**CONSTRUCTION WORK** means the total construction, and services required or inferable from the Contract Documents, whether completed or partially completed, and includes all labor, materials, equipment, supervision, or services, provided or to be provided by Contractor, its Subcontractors, vendors, or suppliers, to fulfill Contractor's obligations. The Construction Work may constitute the whole or part of a Project.

**COST OF THE DESIGN SERVICES** shall mean the lump sum fixed price cost to Qwest of Contractor's complete performance of the Design Services.

**COST OF THE CONSTRUCTION WORK** shall have the meaning described in Paragraph 18.

**DAY** shall mean a calendar day and shall include Saturdays, Sundays, and holidays, except that, in the event that an obligation to be performed under the Contract Documents falls due on a day that is not a Business Day, the obligation shall be deemed due on the next Business Day thereafter.

**DESIGN SERVICES** shall mean the provision of all labor, materials, supervision, and professional services necessary to produce Specifications and Drawings of such quality and in such detail as appropriate for the Construction Work to be performed

on the Project. Design Services, at a minimum shall include the provision of Drawings and Specifications and estimates of the Cost of the Construction Work, Contract Time, and a Construction Schedule.

**DRAWINGS** means the graphic and pictorial portions of the Contract Documents, wherever located and wherever issued, showing the design, location, and dimensions of the Construction Work, generally including plans, elevations, sections, details, schedules, and diagrams.

**FINAL COMPLETION** shall have the meaning defined in Paragraph 41(c).

**GUARANTEED MAXIMUM PRICE (GMP)** shall have the meaning defined in Paragraph 18.

**LAW** shall mean any act, decree, rule, law, ordinance, legislation, statute, directive, regulation, notification, injunction, writ, policy, bylaw, administrative guideline, ruling, instruction, treaty, judgment or order of a court or any interpretation thereof enacted, issued, or promulgated by any governmental entity and applicable to the Project, the Design Services, and Construction Work, Qwest, Contractor or any of its Design Subcontractors or Subcontractors, as the case may be.

**LIQUIDATED DAMAGES** shall mean the sums which Contractor will pay Qwest as damages if it fails to meet its obligations pursuant to Paragraph 27 and the relevant Contract Order.

**PARTY OR PARTIES** shall mean Qwest or Contractor or both, as the context may require.

**PROJECT** is the total Design Services and Construction Work performed pursuant to the Contract Documents by Contractor and may be the whole or part, and which may also include design or construction by Qwest or by separate contractors.

**PUNCH LIST** shall mean the list prepared, periodically revised as necessary, by Qwest, with the full cooperation of Contractor, which list shall set forth certain Construction Work that remains to be performed to ensure that all of the Construction Work complies with all the standards and requirements of the Contract Documents.

**QWEST'S REPRESENTATIVE** shall mean a person identified in each Contract Order having the responsibility and authority described in Paragraph 14.

**REQUEST FOR PROPOSAL (RFP)** shall mean a written document promulgated by Qwest that requests a proposal from Contractor pursuant to this Master Agreement and a Contract Order. The RFP may include, among other things: a description of the Design Services and Construction Work to be performed; the location of the Project; the Contract Time; the identity of Qwest's Representative; Qwest's estimate of the Cost of the Design Services and Cost of the Construction Work; and, the rate of Liquidated Damages, if any.

Master Contract No. BZ980026

**SPECIFICATIONS**  means that portion of the Contract Documents consisting of the written requirements for materials, equipment, construction systems, standards, and workmanship for the Construction Work, and performance of related services.

**SUBCONTRACTOR**  shall have the meaning defined in Paragraph 12.

**SUBSTANTIAL COMPLETION**  shall have the meaning defined in Paragraph 40(a).

# EXHIBIT C

# AMENDMENT TO THE MASTER CONSTRUCTION AGREEMENT

This amendment to the Master Construction Agreement ("Amendment") is entered into as of the 25th day of June, 1998 (the "Effective Date"), by and between Qwest Communications Corporation ("Qwest") and Builders Group, ("Contractor").

## Recitals

A.    The Parties entered into a Master Construction Agreement No. BZ980026 dated June 25, 1998 ("Master Agreement").

B.    Qwest and Contractor desire to amend the Master Agreement as described below.

## Amendments

In consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Qwest and Contractor agree as follows:

1.    Paragraph 8 is amended by deleting Subparagraphs (h) and (i).

2.    Paragraph 9 is amended by adding the following new Subparagraphs:

(g)  Contractor shall prepare, or cause to be prepared, as part of the Construction Work, all shop drawings, samples, submittals and detail drawings not made a part of the Specifications and Drawings which are required in the performance of Contractor's obligations under a Contract Order.  The Design Subcontractors or Contractor shall review all shop drawings, submittals, detail drawings, and samples for the benefit of Qwest.  Failure of shop drawings, submittals, detail drawings, or samples to comply with the Contract Documents or any Laws will be the sole responsibility of Contractor.

(h)  Contractor shall maintain one record set of the Contract Documents in good order and marked currently to record all changes made during Construction and an accurate location of all portions of the Construction Work sufficient for the Contractor to prepare accurate as-built drawings.  All Contract Documents shall be delivered to Qwest upon Final Completion of the Construction Work.

3.    Paragraph 19 is amended by deleting Sub-subparagraph 19(a)(i) and replacing with:  A percentage of the costs which may be reimbursed under Sub-subparagraph 20.(c)(i) through 20.(c)(viii), such percentage will be negotiated

between Qwest and Contractor following receipt of Contractor's proposal in response to Part 1 of Qwest's RFP.

4.    Paragraph 20 is amended by deleting Sub-subparagraph 20.(c)(vii) and replace with: Payments due and owing by Contractor to Subcontractors for Construction Work, including costs of transportation and storage thereof, which is not supplied by Qwest.

5.    Paragraph 20 is amended by changing the mileage rate in Sub-subparagraph 20.(c)(x)b from $.28 to $.325.

6.    Add new Sub-subparagraph 20.(c)(xi):  Costs due to an emergency affecting persons or property if uninsured by Contractor and not caused by acts or omissions of Contractor.

7.    Delete Sub-subparagraph 20.(d)(viii).

8.    Replace Paragraph 23 in its entirety with:

a.    The Design Services and Construction Work will be subject to changes by additions, deletions, or revisions by the Change Order process. Either Party may initiate a request for a Change Order, however, Qwest's Manager of Contract Administration is the only person authorized to issue the form for execution.  In no event will Change Orders be processed on Contractor prepared forms.

b.    Within five (5) Days of receipt of a request for a Change Order, Contractor will submit its proposal in response thereto, to Qwest's Representative.  Such proposal will include, if applicable, a detailed cost estimate for the proposed change together with any adjustments in the lump sum fixed price, GMP, Cost of the Construction Work, Construction Schedule and Contract Time required for the performance of the Design Services or Construction Work as modified.  Requests for extensions of Contract Time shall be accompanied with a fragmentary network for the Construction Schedule, or, if required, a complete update to demonstrate the impact of the proposed change on the Construction Schedule.

c.    Change Orders, prepared by Qwest's Manager of Contract Administration, must be signed by Qwest and Contractor in order to be binding on either.  Contractor shall not perform changes in the Design Services or Construction Work in accordance with Subparagraphs 23.(a) and 23.(b) above until both Parties have signified their acceptance of the impact on the lump sum fixed price applicable to the Design Services, GMP, Cost of the Construction Work, Construction Schedule, and Contract Time, if any, by signing the Change Order.  Once the Change Order has been signed by Qwest and Contractor, then Contractor shall diligently perform the Design Services or Construction Work.

  d.  Contractor shall not suspend performance of Design Services or Construction Work not the subject of the Change Order, pending the review and negotiation of any Change Order, except as may be directed by Qwest's Representative.

  e.  Contractor shall not comply with oral requests for changes in the Design Services or Construction Work received from Qwest unless Contractor deems that such changes will not affect the lump sum fixed price of the Design Services, GMP, Cost of the Construction Work, Construction Schedule, Contract Time, or integrity of the Design Services or Construction Work. If Contractor believes that any oral request for a change in the Design Services or Construction Work may involve a change in the lump sum fixed price, GMP, Cost of the Construction Work, Construction Schedule, Contract Time, or integrity of the Design Services or Construction Work, Contractor shall require that the change be requested in writing and shall comply with all terms of this Paragraph 23. Any and all costs incurred by Contractor to perform changes requested orally shall be for Contractor's account and Contractor shall not be entitled to claim any additional Contract Time or reimbursement for increased Costs of the Construction Work or increases in the cost of the Design Services.

  f.  In no event shall Contractor be entitled to compensation for its costs in executing Change Orders unless Qwest's Manager of Contract Administration authorizes such action by issuance of a Change Order which will describe the change, detail the pricing of the change, and identify any adjustment in the time of performance of the Design Services or Construction Work. Upon receiving such authorization from Qwest, Contractor shall diligently perform the Change Order in conformity with the Contract Documents.

  g.  Qwest will not pay Contractor for any of its costs associated with preparing proposals pursuant to a Change Order request if the Change Order is not executed.

  h.  Qwest shall have the right to order minor changes in the Design Services or Construction Work not involving adjustment in the lump sum fixed price, GMP or Contract Time and otherwise not inconsistent with the intent of the Contract Documents. Such changes shall be effected by order and shall be binding on Qwest and Contractor. Contractor shall carry out such orders promptly.

  9.  Paragraph 25 is amended by deleting Subparagraph (c).

  10.  Paragraph 29 is amended by deleting the last sentence of Subparagraph (b).

11.     As modified hereby, the Master Agreement remains in full force and effect, and Qwest and Contractor ratify and affirm the Master Agreement in all respects.

Qwest and Contractor have executed this Amendment effective as of the Effective Date.

QWEST:                                              CONTRACTOR:

Qwest Communications Corporation          Builders Group

By: _____             By: _____

Name: August B. Turturro                          Name: _____ George Figliolia _____

Title: Senior Vice President                        Title: _____ President _____

Date: _____         Date: _____

855541.01
DENVER:0855541.01