UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------

BUILDERS GROUP LLC, d/b/a BUILDERS    :        **1:07-cv-5464 (DAB)**
GROUP TECHNOLOGIES,                   :
                                      :        **ECF CASE**
                    Plaintiff,        :
                                      :        **CIVIL ACTION**
        -against-                     :
                                      :        **REPLY AFFIDAVIT OF ROBERT**
QWEST COMMUNICATIONS                  :        **BACHMEIER IN SUPPORT OF**
CORPORATION,                          :        **MOTION TO STAY ACTION AND**
                                      :        **COMPEL ARBITRATION**
                    Defendant.        :
                                      :
--------------------------------------------------------- :


STATE OF MICHIGAN          )
                           ) ss.
COUNTY OF WAYNE            )

I, Robert Bachmeier, being of lawful age and first duly sworn upon oath, hereby state and

affirm that:

1.      As I previously averred in my Affidavit, dated August 22, 2007, SDNY

Electronic Docket Document No. 7 (hereinafter "Doc __"), submitted in support of Qwest

Communications Corporation's motion to stay this action and compel arbitration of the matters

in dispute between the parties, I am a former employee of an affiliate of Qwest with personal

knowledge of certain of the facts and circumstances underlying the motion. Doc 7 at ¶1. I have

read the brief and the Affidavits of Issac Stareshefsky and Scott E. Silberfein submitted in

opposition to Qwest's motion. I submit this Reply Affidavit in to response to certain elements of

plaintiff's opposition to the motion.

*The Interaction of the Parties' Contract Documents*

2.      I am aware of plaintiff's argument that the parties' Master Construction

Agreement No. BZ 980026 ("the Master Contract"), portions of which were attached to my

initial Affidavit, Doc 7, as Exhibit B is not related to the parties' signed Contract Order 8349, attached to my initial Affidavit as Exhibit A. Opposition Brief at page 1. ("Opp. at __").

3.      As was the case with virtually every one of the Qwest construction projects involving a general contractor such as Builders Group that I directly managed during my years with the company from 1998 through the end of 2006, a Master Construction Agreement similar in form and content to the Master Contract provided certain of the general terms of the relationship between Qwest and its construction contractors, including terms regarding the interrelationship of the various contract documents such as the Contract Orders similar to Contract Order 8349 which is at issue here.

4.      Attached to this Affidavit as Exhibit 1 is a true, correct and complete copy of the parties' Master Contract, portions of which were attached as Exhibit B of my initial Affidavit. The interaction of the parties' contract documents is set forth in the Master Contract at Sections 4 and 5. Specifically, the Master Contract provides that the contract documents, including the Master Contract itself and Contract Orders "shall comprise and represent the entire and integrated contractual agreement between the Parties ...." *Id.* at Ex. 1, §4. Section 5 of the Master Contract further lays out the "Correlation and Intent" of the contract documents, specifying that they are "... complementary, and what is required by one shall be as binding as if required by all ...." *Id.* at §5.

5.      The role of Contract Orders is to provide only certain details of a particular project, such as a description of the work, the start and completion dates and the price and, of course, to incorporate the Master Contract by specific reference. With regard to Contract Order 8349, which was signed by the parties, the Master Contract is expressly incorporated by reference to the specific Master Contract number – BZ 980026. See my initial Affidavit, Ex. A, Doc 7, at the very top of the first page.

*The O'Kane Action Subpoena*

6.      At paragraph 4 and footnote 3, Mr. Silberfein's Affidavit, Doc 15, avers that

Qwest did not produce the Master Contract or its Amendment in response to the *O'Kane*

subpoena.  This statement is true so far as it goes, but it omits much.  Based on this statement,

the opposition brief and Mr. Silberfein's Affidavit argue by implication that Qwest should have

produced the Master Contract in response to the subpoena and that Qwest's "failure" to do so

should cast doubt on Qwest's proffer of the document now.

7.      What Mr. Silberfein left out of his affidavit is that Qwest and counsel for O'Kane

agreed to a modification of the initial subpoena that is attached to his Affidavit as Exhibit A. Doc

15.  Under this agreement, Qwest was to provide only copies of documents regarding invoicing

by plaintiff and payments by Qwest under Contract Order 8349, which pertains to the 60 Hudson

Street project.  In this regard, I refer the Court to the annexed copy of a fax transmission and e-

mail from O'Kane's counsel, Daniel Gammerman, to Qwest's in-house attorney, Martin

Steinberg, who advised and assisted me in gathering and producing documents in response to the

O'Kane subpoena.  See attached Exhibit 2.

8.      The last paragraph of the first page of Mr. Gammerman's e-mail refers to

Contract Order 8349.  The first paragraph refers to the "agree[ment]" to "limit[]" the subpoena.

See attached Exhibit 1 at the second page.  As I testified at my deposition, and as Mr.

Gammerman confirmed on the record, although there were many additional Contract Orders

between Qwest and plaintiff, the subpoena was limited by agreement to documents pertaining to

Contract Order 8349.  See Doc 15, Ex. B at page 26, lines 9 to 16; page 30, line 10; and page 8,

line 23 to page 9, line 1.

9.    Mr. Silberfein also omitted from his Affidavit that he protested the limited production of documents on the record at my deposition and indicated that he would press his own requests for additional documents. See Doc 15, Ex. B at pages 29 to 35. So far as I am aware, neither Mr. Silberfein nor anyone else on behalf of plaintiff has ever asked Qwest for additional documentation, and particularly not the Master Contract or its Amendment.

*The Parties' Agreement Was Capable of Performance within One Year*

10.    I am aware of plaintiff's argument that the parties' construction agreement was not capable of performance within one year. Opp. at Point I.2. This is not so. Although the term of the Master Contract is not expressed by reference to fixed dates, see attached Ex. 1 at §44, the Master Contract provided for termination of the contract for cause or for the convenience of the parties. See attached Exhibit 1 §§32 and 33.. All of the termination events described therein were capable of occurring immediately or in a very short period of time. With regard to the term expressed in Section 44, which made the Master Contract coextensive with the last of the parties' Contract Orders, Contract Order 8349 itself provided a term of about two months, including a start date of November 15, 2000 and a substantial completion date of December 15, 2000. Although plaintiff's brief makes the argument, see Opp. at 4, there is no evidence in Mr. Stareshefsky's Affidavit to support the claim that the 60 Hudson Street project could not have been completed sooner than it, in fact, was. See *id*., Doc 14 at ¶4.

*Plaintiff is a Large, National Construction Company*

11.    I am aware of plaintiff's argument that Builders Group is entitled to relief from the arbitration clause in question because, among other things, it is a small, local contractor. Opp. at Point IV. Attached as Exhibit 3 are true copies of pages printed last week from plaintiff's website. In this self-portrait, plaintiff states that it is a construction industry "leader"

that has "expanded beyond the [New York] region to working throughout the country, [and is] now licensed throughout the United States."

*Plaintiff Has Been Paid in Full for the Work in Question*

12.    The parties' Contract Order 8349 called for payment to plaintiff to be in an agreed sum known as the Guaranteed Maximum Price. ("GMP"). See Doc 7, Ex. A. Pursuant to the Master Contract, the amount paid to plaintiff "will not exceed the GMP set forth in Part 2 of the Contract Order." See attached Exhibit A at §18(b). The Master Contract also gave Qwest the right to require plaintiff to furnish plenary lien waivers and releases under oath before making payments. See *id.* at §§21(c) and 28. In connection with my work for Qwest responding to plaintiff's demands for additional payments in the period from 2004 to 2006 – years after the work was completed and payment was made – I learned that plaintiff, by its Assistant Project Manager Louis Figliolia III, had executed a Contractor's Final Affidavit, Release and Lien Waiver on August 26, 2003, essentially stating under oath that the GMP had been paid to plaintiff in full and releasing all liens and claims. A true copy of plaintiff's Final Affidavit, Release and Lien Waiver is attached as Exhibit 4.

13.    At various times between 2004 and 2006, I and others at Qwest responded to demands by plaintiff, through its President and CEO, George Figliolia, for further payments on the 60 Hudson Street project. These demands were not accompanied by invoice numbers or other charge- or payment-identifying data. Rather, they were expressed as general statements of plaintiff's account. I investigated certain of these requests and determined that plaintiff had been paid in full and executed a final lien release. I informed Mr. Figliolia of these facts by e-mail on at least two occasions -- April 30 and July 12, 2004. True copies of my e-mails to Mr. Figliolia of these dates are attached as Exhibits 5 and 6.

14.    Master Contract §43(c) provides that plaintiff may request arbitration of any claim or dispute. See attached Ex. 1. At no time during my work on the plaintiff's account, beginning in 2004 and ending on December 31, 2006, was I made aware of any request for arbitration made by plaintiff.

*Robert Bachmeier*
Robert Bachmeier

Sworn to me before this
21 day of November 2007

*Krista Long*
Notary Public

```
KRISTA LONG
NOTARY PUBLIC – MICHIGAN
WASHTENAW COUNTY
ACTING IN THE COUNTY OF  Wayne
MY COMMISSION EXPIRES 08-28-2014
```

- 6 -

# EXHIBIT 1

**Master Contract No. BZ980026**

# TABLE OF CONTENTS

**Page**

1. The Request For Proposal Process.................................................................. 1

2. Contractor's Representations .................................................................. 3

3. Qwest's Representations ........................................................................ 3

4. Contract Documents .............................................................................. 4

5. Correlation and Intent ......................................................................... 4

6. Ownership of Documents ......................................................................... 5

7. Qwest's Duties ................................................................................... 5

8. Contractor's Design Services ................................................................... 6

9. Contractor's Construction Work ................................................................. 7

10. Contractor's Review Of Job Site Conditions.................................................... 8

11. Contractor's Personnel ........................................................................ 8

12. Award Of Construction Work Subcontracts ...................................................... 9

13. Qwest's Right To Perform And To Award Separate Contracts..................................... 10

14. Qwest's Representative ....................................................................... 10

15. Inspection, Testing, and Quality Control .................................................... 11

16. Warranty ..................................................................................... 12

17. Material and Equipment Substitutions ........................................................ 13

18. Cost Of The Construction Work And GMP ....................................................... 14

19. Contractor's Fee ............................................................................. 14

20. Cost Of The Construction Work ............................................................... 15

21. Applications For Payment ..................................................................... 17

22. Right To Offset.............................................................................. 18

23. Change Orders ............................................................................... 18

24. Time........................................................................................ 19

25. Excusable Delays ............................................................................ 20

26. Claims...................................................................................... 21

27. Liquidated Damages........................................................................... 22

28. Lien Waivers ................................................................................ 22

29. Care, Custody, Control, And Title To Materials And Equipment ................................ 22

30. Royalties and Patents ....................................................................... 23

31. Suspension of Work........................................................................... 23

32. Termination For Cause........................................................................ 24

# TABLE OF CONTENTS

**Page**

33. Termination For Convenience ..................................................................... 26

34. Indemnity ........................................................................................................ 29

35. Insurance ........................................................................................................ 30

36. Performance and Payment Bonds ............................................................... 31

37. Safety ............................................................................................................... 32

38. Cleanup And Disposal Of Waste ................................................................. 34

39. Notices ............................................................................................................. 35

40. Notice of Substantial Completion .............................................................. 35

41. Final Completion and Final Payment ......................................................... 36

42. Partial Occupancy or Use ............................................................................. 37

43. Arbitration ...................................................................................................... 38

44. Term ................................................................................................................. 39

45. Entire Agreement; Amendments ................................................................. 40

46. Governing Law ............................................................................................... 40

47. Separability ..................................................................................................... 40

48. Waivers ............................................................................................................ 40

49. References To Paragraphs Or Subparagraphs, Exhibits, Schedules And
    Contract Orders ............................................................................................. 40

50. Counterparts ................................................................................................... 40

51. Headings .......................................................................................................... 40

52. Agreement Not Construed Against Draftsman .......................................... 40

53. Assignment ..................................................................................................... 41

54. Compliance With Laws ................................................................................. 41

55. Immigration .................................................................................................... 41

56. Nondiscrimination ......................................................................................... 41

57. Labor Relations .............................................................................................. 41

58. Prohibited Relationships And Gratuities ................................................... 42

59. No Contractual Relationship ........................................................................ 42

60. Confidentiality ............................................................................................... 42

61. Use Of Qwest's Name ................................................................................... 44

**Master Contract No. BZ980026**

# TABLE OF CONTENTS

<u>**Page**</u>

Glossary of Terms .......................................................................... 46

# Master Construction Agreement

THIS MASTER CONSTRUCTION AGREEMENT ("Master Agreement"), to be used with subsequently executed individually numbered agreements ("Contract Orders"), is entered into by and between QWEST COMMUNICATIONS CORPORATION, a Delaware corporation ("Qwest"), and BUILDERS GROUP ("Contractor"), effective as of June 25, 1998 (the "Effective Date").

## Glossary of Terms

Capitalized terms used herein shall have the meanings ascribed to them where first used or, if not defined where first used, in the Glossary of Terms, attached hereto.

## Background

A.    Qwest is in the business, among other things, of constructing, owning and operating fiber optic communications networks.

B.    Contractor is in the business, among other things, of designing and constructing facilities for fiber optic communications networks.

C.    Qwest desires from time to time to retain Contractor to perform Design Services and Construction Work as more specifically described in Contract Orders.

D.    Contractor desires to undertake performance of the Design Services and Construction Work, subject always to the terms and conditions of this Master Agreement and the related Contract Order.

Now, therefore, the Parties, mutually intending to be bound, agree as follows:

## Agreements

**1.    The Request For Proposal Process.**

(a)    During the term of this Master Agreement, Contractor will be available to respond to Part 1 and Part 2 of Qwest's Request(s) for Proposals ("RFP(s)") to perform Design Services and Construction Work associated with particular Contract Orders.

(b)    Contractor will furnish its lump-sum fixed price proposal to perform the Design Services associated with a particular Contract Order in its response to Part 1 of Qwest's Request for Proposal ("RFP"). Contractor's proposal shall constitute an offer by Contractor to perform the Design Services on the terms set forth in this Master Agreement, Part 1 of the RFP, and Part 1 of the Contract Order. Such offer will be held open by Contractor for thirty (30) Days. Part 1 of Qwest's RFP shall

include a description of the Design Services required ("Deliverables"), the location of the Project, the amount of time available for completion of the Design Services, and any other matters which Qwest determines to be material to the performance of the Design Services.

(c)    If Contractor's Part 1 proposal is accepted by Qwest, Contractor and Qwest will execute Part 1 of the Contract Order and Contractor shall forthwith begin performance of the Design Services.  Deliverables, at a minimum, will consist of:  (1) Drawings and Specifications; (2) an estimate of the Cost of the Construction Work; (3) a Construction Schedule; and, (4) an estimated Guaranteed Maximum Price ("GMP") for the Construction Work.

(d)    Following completion of the Design Services pursuant to Part 1 of the Contract Order, Contractor will submit its Part 2 proposal to perform the Construction Work in response to Part 2 of Qwest's RFP.  Contractor's proposal in response to Part 2 of Qwest's RFP shall constitute an offer by Contractor to perform the Construction Work on the terms set forth in this Master Agreement, Part 2 of Qwest's RFP, and Part 2 of the Contract Order.  Such offer shall be held open by Contractor for thirty (30) Days.  Contractor's Part 2 proposal shall include, at a minimum, Contractor's estimate of the time to complete the Construction Work ("Contract Time"), Contractor's estimate of the Cost of the Construction Work, and Contractor's estimated GMP.

(e)    Following negotiation of the above referenced estimates to firm commitments, Qwest may accept Contractor's proposal in response to Part 2 of Qwest's RFP.  If Contractor's Part 2 proposal is accepted by Qwest, Contractor and Qwest will execute Part 2 of the Contract Order and Contractor shall forthwith begin performance of the Construction Work.

(f)    This Master Agreement is nonexclusive.  Qwest shall be under no obligation to engage Contractor to perform all or any part of the Design Services or Construction Work, or to reimburse Contractor for costs associated with its preparing a proposal in response to the either Part 1 or Part 2 of Qwest's RFP.  Qwest may accept Contractor's Design Services proposal in response to Part 1 of Qwest's RFP, but use another contractor to perform the Construction Work required by Part 2 of Qwest's RFP.

(g)    All Design Services will be performed for a lump-sum fixed price. Contractor shall be paid for Design Services in a manner agreed to at the time of execution of Part 1 of the Contract Order.  All Construction Work will be performed on the basis of the Cost of the Construction Work, plus Contractor's Fee stipulated herein, with a GMP.  Contractor shall be paid for Construction Work on a monthly basis following its submission of an application for payment.

(h)    Contractor is an independent party engaged by Qwest on an as needed basis.  Nothing contained herein shall be construed to indicate that Contractor and Qwest have other than an independent contractor relationship.

Master Contract No. BZ980026

**2. CONTRACTOR'S REPRESENTATIONS.** Contractor represents to Qwest as follows:

(a)    Contractor is a corporation duly organized, validly existing and in good standing under the Laws of its place of incorporation and the execution, delivery, and performance of this Master Agreement, and related Contract Orders, on the part of Contractor, have been, or will be, duly authorized by all requisite corporate actions;

(b)    Contractor is not in violation of any Law which violation, individually or in the aggregate, would materially and adversely affect Contractor's performance and its obligations under this Master Agreement, and related Contract Orders;

(c)    Contractor will be qualified to do business in all jurisdictions in which such qualification is required in connection with its performance of Design Services or Construction Work;

(d)    Contractor is not a party to any legal, administrative, arbitrable, investigatory, or other proceeding or controversy pending, or, to the best of Contractor's knowledge, threatened, that would materially and adversely affect Contractor's ability to perform its obligations under this Master Agreement, or related Contract Orders;

(e)    This Master Agreement, and any Contract Orders subsequently executed, are duly executed and delivered and constitute legal, valid, and binding obligations of Contractor enforceable against Contractor in accordance with their terms;

(f)    Contractor is knowledgeable and experienced in designing, or causing to be designed, and constructing the type of projects that will be required by the Contract Orders executed pursuant to this Master Agreement, and the Design Services and Construction Work will be completed in accordance with this Master Agreement and the particular Contract Order, and will be fit for its intended purpose; and

(g)    Contractor has an adequate staff of properly trained, licensed, and qualified personnel for the performance of the obligations to be undertaken by Contractor.

**3. QWEST'S REPRESENTATIONS.** Qwest represents to Contractor as follows:

(a)    Qwest is a corporation duly organized, validly existing and in good standing under the Laws of Delaware and the execution, delivery, and performance of this Master Agreement have been duly authorized on the part of Qwest by all requisite corporate action;

(b)    Qwest is not in violation of any Law which violation, individually or in the aggregate, would materially and adversely affect Qwest's performance of its obligations under this Master Agreement;

(c)    Qwest will be qualified to do business in all jurisdictions in which qualification will be required in connection with the execution of Contract Orders;

**Master Contract No. BZ980026**

     (d)    Qwest is not a party to any legal, administrative, arbitrable, investigatory or other proceeding or controversy pending, or, to the best of Qwest's knowledge, threatened, that would materially adversely affect Qwest's ability to perform its obligations under this Master Agreement or subsequently issued Contract Orders; and

     (e)    This Master Agreement, and subsequently executed Contract Orders, are duly executed and delivered and constitute legal, valid, and binding obligations of Qwest enforceable against Qwest in accordance with their terms.

**4.**    **CONTRACT DOCUMENTS.**  The Contract Documents shall consist of the following:

     (a)    This Master Agreement;

     (b)    Any exhibits, Change Orders, or amendments to the Master Agreement or any Contract Order; and

     (c)    All Specifications and Drawings.

The above listed Contract Documents shall comprise and represent the entire and integrated contractual agreement between the Parties, and shall supersede all prior or contemporaneous negotiations, representations, and agreements, either oral or written.  This Master Agreement shall remain in effect as to all Contract Orders referring hereto except to the extent specifically modified by the terms of any Contract Order or modified by a written instrument executed by both Parties.

**5.**    **CORRELATION AND INTENT.**

     (a)    The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Design Services and Construction Work by Contractor .  The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by Contractor shall be required to the extent consistent with the Contract Documents and inferable from them as being necessary to produce the intended results.

     (b)    Unless otherwise stated in the Contract Documents, words which have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

     (c)    All Designed Services and Construction Work mentioned or indicated in the Contract Documents shall be performed by Contractor as part of this Master Agreement unless it is specifically indicated in the Contract Documents that such Design Services and Construction Work is to be performed by Qwest or separate contractors.

     (d)    In the event of any conflict(s) among the Contract Documents, the precedences in resolving such conflict(s) shall be as follows:

Master Contract No. BZ980026

       (i)  . Contract Orders shall govern over the terms of the Master Agreement.

       (ii)     Master Agreement shall govern over Specifications.

       (iii)     Specifications shall govern over Drawings.

       (iv)     Construction schedules shall govern over Drawings.

       (v)     Large-scale Drawings shall govern over smaller scale Drawings.

       (vi)     Greater quantities shall govern over lesser.

       (vii)     Higher quality shall govern over lesser quality.

Although the above precedences are listed in an order, they SHALL NOT be construed to mean the order of precedence, they apply only as specifically stated.

**6.** **OWNERSHIP OF DOCUMENTS.** All Drawings and Specifications, and other documents and electronic data furnished or prepared by Contractor as a result of performing Design Services or Construction Work pursuant to this Master Agreement and any Contract Orders are the property of Qwest. Contractor does hereby assign to Qwest all intellectual property rights arising out of its performance of Design Services or Construction Work. Contractor shall be permitted to retain copies for information and reference. Any Drawings and Specifications and other documents and electronic data are to be used only with respect to the related Contract Order or subsequent additions or modifications thereto, and shall not be used for any other purposes by Contractor without the express written consent of Qwest.

**7.** **QWEST'S DUTIES .** Commencing with the execution of Part 1 or Part 2 of a Contract Order, Qwest shall:  obtain and afford to Contractor rights of access to and use of the job site consistent with the Design Services and Construction Work to be performed; inform Contractor of any material or structural job site defects or hazardous environmental conditions, of which Qwest has actual knowledge; and, deliver any equipment or materials to the job site which are to be provided by Qwest. Notwithstanding the above obligation to inform Contractor of job site defects or hazardous materials, Qwest shall have no obligation to perform any inspections or tests for the benefit of Contractor to determine if any such conditions exist. Additionally, Qwest shall furnish Contractor with lease terms, rules and regulations, and as-built drawings relevant to the performance of Design Services or Construction Work that Qwest already has in its possession and are not confidential or proprietary.

8.    **CONTRACTOR'S DESIGN SERVICES**.  When performing Design Services described in a Contract Order:

(a)    All design documents prepared or furnished by the Contractor, its affiliates, Subcontractors or consultants (all collectively known as "Design Subcontractors"), including, without limitation, the Drawings and Specifications, shall comply with all applicable Laws.

(b)    The Design Services provided under this Master Agreement shall be performed in conformance with the standards of care and quality adopted or accepted by nationally recognized architectural and engineering organizations.  Any Drawings or Specifications prepared or furnished by Contractor or Design Subcontractors that fail to meet the requirements of this Master Agreement, or are otherwise defective or contain errors, conflicts or omissions will be promptly corrected by Contractor at no cost to Qwest.  Contractor will provide to Qwest Specifications and Drawings that will be adequate and fit to accomplish the intended purpose(s) of the Project.  Contractor will promptly reimburse Qwest for any and all foreseeable damages, including without limitation fines, resulting from the use of such defective Drawings or Specifications.  Qwest's approval, acceptance, use of, or payment for, all or any part of the Design Services shall in no way alter Contractor's obligations or Qwest's rights hereunder.

(c)    Qwest's review or approval of the Specifications and Drawings shall in no way diminish or release Contractor's obligations hereunder.

(d)    Contractor shall be fully responsible for the Design Services performed pursuant to a Contract Order regardless of whether performed by its own employees or by Design Subcontractors.

(e)    The Design Services shall be performed as expeditiously as is consistent with professional skill and care and the orderly progress of the Project.

(f)    The Design Services shall include, without limitation, architectural, structural, mechanical, electrical and any other engineering services necessary to produce a complete and accurate set of Specifications and Drawings suitable for performing the Construction Work.

(g)    Contractor shall be responsible for preparing and filing the documents required for approval of governing authorities having jurisdiction over the Project to ensure that final approval and permits for the performance of the Construction Work will be obtainable in a timely fashion.

(h)    Contractor shall prepare, or cause to be prepared, as part of the Design Services, all shop drawings, samples, submittals and detail drawings not made a part of the Specifications and Drawings which are required in the performance of the Contractor's obligations under a Contract Order.  The Design Subcontractors will review all shop drawings, submittals, detail drawings, and samples for the benefit of

Master Contract No. BZ980026

Contractor and Qwest. Failure of shop drawings, submittals, detail drawings or samples to comply with the Contract Documents or any Laws will be the sole responsibility of Contractor and Design Subcontractors.

(i)     Contractor shall maintain one record set of the Contract Documents in good order and marked currently to record all changes made during construction and an accurate location of all portions of the Construction Work sufficient for the Contractor to prepare accurate as-built drawings. All Contract Documents shall be delivered to Qwest upon Final Completion of the Construction Work.

## 9.    CONTRACTOR'S CONSTRUCTION WORK. When performing Construction Work described in a Contract Order:

(a)     Contractor shall furnish all management, material, equipment, labor, and supervision required to complete the Construction Work free of defects and faulty workmanship and in conformity with the Contract Documents. Contractor shall be solely responsible for the means, methods, techniques, sequences, and procedures of construction. Contractor shall be responsible to Qwest for the acts and omissions of all Contractor's employees and Subcontractors of every tier, their agents and employees, and all other persons performing any of the Construction Work under direction of, or pursuant to a contract with Contractor;

(b)     Contractor shall perform with diligence all Construction Work described in the Contract Order, in accordance with any and all applicable requirements which may be imposed by Law. In the event of a conflict between any applicable requirement of such governmental authorities and any requirement otherwise made applicable by the Contract Documents, the stricter requirement or specification shall govern unless contrary to Law. If Contractor fails to perform the Construction Work in accordance with any requirement herein specified, Contractor shall protect Qwest and hold it harmless from all delays, damages, fines and penalties arising from such failure and shall bear all costs arising therefrom including attorneys' fees, costs, fines, and penalties;

(c)     Contractor, always as an independent contractor, shall perform the Construction Work in a safe, timely, proper, and secure manner with the utmost care so as to prevent loss, injury, or damage to any person or property, and to prevent danger to life and, in particular, to prevent any damage to Qwest's property or the unreasonable interruption of any of its communications services. If, in the opinion of Qwest, the Construction Work is not being so performed, Qwest may order the Construction Work stopped and not resumed until, in its opinion, proper means and methods have been adopted by Contractor to ensure the performance in a manner that will prevent any threatened loss, injury, damage, danger, or interruption of services. If deemed necessary to avoid or prevent any loss, injury, or damage referred to above, Contractor shall begin and carry out the Construction Work covered under the provisions of this Master Agreement at such points, in such order of precedence and at such time as Qwest may direct;

(d)     Contractor shall secure all required permits and shall secure and pay for all of the fees, charges, taxes, licenses, authorizations, and inspections necessary for

Master Contract No. BZ980026

proper execution of the Construction Work associated with a Contract Order. Contractor shall secure and pay for all certificates of inspection and of occupancies that may be required by authorities having jurisdiction over the Construction Work. No extension of Contract Time for completion of the Construction Work will be granted for delays associated with meeting the requirements of this Subparagraph if such delays are the fault of Contractor; and

(e)     Contractor shall keep fully informed of all Laws, which in any manner affect those engaged or employed in the Construction Work, or which in any way affect the performance of the Construction Work. Contractor shall at all times observe and comply with all such Laws, and shall defend, hold harmless and indemnify Qwest and all Qwest's officers, agents, and servants, against any claim or liability arising from or based on the violation of such Laws, whether by Contractor, Contractor's employees or Subcontractors. Contractor shall pay any costs or penalties attributable to its performing Construction Work that is contrary to any Law.

(f)     Contractor shall deliver to Qwest all equipment data, along with its recommended spare parts list, maintenance manuals, manufacturer's warranties and operations manuals as may be required for Qwest's employees or agents to maintain and operate any equipment delivered as a part of the Construction Work.

10.    **CONTRACTOR'S REVIEW OF JOB SITE CONDITIONS**.  Contractor will make a reasonably complete and careful examination of the job site and the surrounding areas to determine the difficulties and circumstances related to the performance of Construction Work pursuant to the Contract Order, including without limitation:

(a)     The location of the Project;

(b)     The condition of the job site and surrounding areas;

(c)     The proximity of the job site to adjacent facilities and structures;

(d)     The nature and character of the soil and terrain of the job site;

(e)     The conditions of the roads, waterways and railroads in the vicinity of the job site, including the conditions affecting shipping, transportation, access, disposal, handling, and storage of materials;

(f)     The labor conditions in the region of the job site; and

(g)     The local weather conditions based upon previous weather data; and, as determined to Contractor's satisfaction, the nature and extent of such difficulties and hazards. Any delays resulting from Contractor's failure to make a reasonably complete and careful examination of the job site and surrounding areas shall not become the basis for claims for an extension of Contract Time.

11.    **CONTRACTOR'S PERSONNEL**.

(a)     Contractor shall provide an adequate number of qualified and competent management and supervisory staff, craft persons, and other personnel to perform the

Design Services and Construction Work. At all times during the course of the Design Services and Construction Work, Contractor shall provide at the job site a qualified, competent, and responsible manager ("Project Manager"). The Project Manager shall have full authority to represent Contractor with respect to any and all matters pertaining to the Contract Order. Direction given to the Project Manager by Qwest's Representative shall be binding on Contractor. Contractor shall furnish Qwest's Representative written appointment of its Project Manager, within seven (7) Days from the execution of a Contract Order. Contractor shall not transfer or remove any of its supervisory or key personnel from performance of the Design Services and Construction Work without the prior approval of Qwest. Such approval shall not be unreasonably withheld.

(b)    Any employees (including a Subcontractor or its employees) of Contractor deemed by Qwest, in its sole judgment, to be objectionable shall be promptly replaced by Contractor at no additional expense to Qwest.

(c)    If requested by Qwest, Contractor shall furnish Qwest with the names and addresses of Contractor's employees, any subcontractors employees, and others who have performed or are performing Design Services or Construction Work.

12.    **AWARD OF CONSTRUCTION WORK SUBCONTRACTS.**

(a)    Subcontractor shall mean any subcontractor, vendor, materialman, or supplier, in each case of any tier, that has a contract, license, or agreement with Contractor to supply equipment, material, services, supervision, consultation, or labor in connection with the performance of the Construction Work. Contractor, as soon as practicable after commencement of the Construction Work, shall furnish in writing to Qwest's Representative the names of Subcontractors (including those who are to furnish materials and equipment fabricated to a special design) proposed for each principle portion of the Construction Work. Qwest will promptly reply to Contractor in writing stating whether or not Qwest has reasonable objection to any such proposed person or entity. Failure of Qwest to reply within ten (10) Days of its receipt of such names of persons or entities, shall constitute notice of no reasonable objection.

(b)    Qwest reserves the right to investigate the qualifications and responsibility of proposed or actual Subcontractors, and to prohibit same from performing Construction Work where such investigation, in the sole judgment of Qwest, reveals that such Subcontractors are unqualified or not responsible. Criteria for such determination may include, without limitation: the Subcontractor's financial condition, its experience, the character and number of its employees, the condition of its equipment, and its past performance of similar work. Contractor shall not contract with any proposed person or entity to whom Qwest has made reasonable and timely objection. Contractor shall not be required to contract with anyone to whom Contractor has made reasonable objection.

(c)    If Qwest has reasonable objection to any such proposed person or entity, Contractor shall submit a substitute to whom Qwest has no reasonable objection.

**Master Contract No. BZ980026**

Any acceptance or rejection of a proposed person or entity by Qwest shall not relieve Contractor of responsibility for the Construction Work.

(d)     Contractor shall not change a Subcontractor, person or entity previously identified by Contractor without permission of Qwest.

(e)     Qwest shall have the right, but not the obligation to review all bids, submittals, or other proposals made to Contractor by any Subcontractor, whether successful, responsive, or utilized in the performance of the Construction Work.

(f)     Qwest shall have the right, but not the obligation to make payment directly to any Subcontractor, at Qwest's sole discretion.

13.    **QWEST'S RIGHT TO PERFORM AND TO AWARD SEPARATE CONTRACTS.**

(a)     Qwest reserves the right to perform Design Services or Construction Work in connection with a particular Contract Order with Qwest's own forces, and to award separate contracts in connection with Design Services or Construction Work outside the scope of Contractor's Design Services or Construction Work.

(b)     Contractor, with Qwest's assistance, shall coordinate the Design Services or Construction Work with each separate contractor, who shall cooperate with Contractor.  Qwest will coordinate its own forces work with the Design Services or Construction Work of Contractor, who shall cooperate with Qwest's forces. Contractor shall coordinate with other separate contractors, if any, and Qwest in reviewing their Construction Schedules.  Qwest may make  revisions to the Construction Schedule deemed necessary after joint review and mutual agreement with Contractor.  The revised Construction Schedule will be incorporated into the Contract Order by Change Order, and shall then constitute the Construction Schedule to be used by Contractor, separate contractors and Qwest, unless subsequently revised.

14.    **QWEST'S REPRESENTATIVE.**

(a)     Qwest's Representative may provide general directions about the Construction Work to be performed, but it shall remain the responsibility of Contractor to see that the assignments of Contractor's employees are properly carried out.  Contractor is responsible for choosing all means and methods to be used in performance of the Construction Work.  Qwest's Representative shall not exercise supervision over Contractor's employees.  Whenever approval or authorization from, or communication or submission to, Qwest is required by the terms of the Contract Documents, such communication or submission shall be directed to Qwest's Representative.  All approvals or authorizations from Qwest shall be issued by Qwest's Representative.  Qwest's Representative will be identified in each Contract Order.

**Master Contract No. BZ980026**

## 15.  INSPECTION, TESTING, AND QUALITY CONTROL.

(a)    Contractor shall inspect all materials, supplies, and equipment that are to be incorporated into the Construction Work related to any Contract Order.  In addition, Contractor shall conduct a continuous program of quality control throughout the execution of the Construction Work.

(b)    Contractor shall, during the course of the performance of the Construction Work hereunder, make or cause to be made, all tests required by the Contract Documents.  If a Contract Order requires installation of material or equipment provided by Qwest, all material or equipment will be delivered by Qwest to Contractor's staging areas, and Contractor shall be responsible for its inspection and testing upon its receipt from Qwest.

(c)    Qwest may require additional inspection and testing following the initial testing and inspection.  If Qwest requires testing beyond that specified in the Contract Documents, Qwest will reimburse Contractor for such testing.  Contractor shall furnish Qwest with documentation reasonably satisfactory to Qwest of the results of all inspections and tests.  Qwest shall be given at least five (5) Business Days notice of any test to be made by Contractor or Contractor's Subcontractors in order that Qwest may witness any such test.

(d)    Qwest and its representatives, and others as may be required by applicable Laws and agreements, shall have the right at all reasonable times to inspect the Construction Work and all material, supplies, and equipment used in the performance of the Construction Work at the job site, or elsewhere, including at Contractor's and its suppliers' or Subcontractors' shops.  Contractor shall provide, or cause others to provide, access to sufficient, safe, and proper facilities for such inspections.  Contractor shall provide Qwest and its representatives every reasonable means for the purpose of inspection, even to the extent that completed Construction Work must be exposed.  If in the judgment and discretion of Qwest or its representatives any Construction Work performed by Contractor or materials furnished by Contractor hereunder are defective or fail to comply with the requirements of the Contract Documents, Contractor shall, at Contractor's expense, immediately repair or replace the Construction Work found to be defective to the satisfaction of Qwest or its representatives.  When Qwest or its representatives request dismantling or exposing finished Construction Work, Contractor shall receive compensation for the extra work involved only if the dismantled or exposed finished Construction Work meets the requirements of the Contract Documents.  In any case, such additional compensation must be authorized pursuant to an executed Change Order.

(e)    Failure on the part of Qwest or its representatives to discover or reject Construction Work furnished by Contractor or any of its Subcontractors that is not in conformity with the requirements of the Contract Documents, shall not be construed to imply acceptance of such Construction Work.  Likewise payment or partial or entire occupancy of the Construction Work by Qwest shall not be construed to be acceptance of the Construction Work which is not in conformance with the Contract Documents.

Master Contract No. BZ980026

(f)     If any material or equipment furnished by Qwest is defective, and the defect was not apparent at the time Contractor installed it, Contractor shall replace the material or equipment and shall be paid for such Construction Work when authorized by a Change Order. If Contractor installs obviously defective material or obviously defective equipment furnished by Qwest, Contractor shall replace said material or equipment at Contractor's expense. Material or equipment furnished by Qwest and damaged by Contractor will be replaced by Qwest at Contractor's expense.

(g)     Rejection by Qwest of any or all parts of defective Construction Work shall be final and binding provided that Qwest shall have notified Contractor of any such defect and reviewed its objections with Contractor. Such rejected Construction Work shall be promptly corrected or replaced by Contractor at Contractor's expense. If Contractor fails to commence and diligently continue correction or replacement of such rejected Construction Work within seven (7) Days after receipt of notice from Qwest to correct or replace the rejected Construction Work, Qwest may at its option remove and replace the rejected Construction Work, and Contractor shall promptly reimburse Qwest for the cost of such removal and replacement of defective and rejected Construction Work, or alternatively, Qwest may at its option deduct any such costs so incurred from any payments due Contractor.

(h)     All Construction Work performed by Contractor shall be subject to coordination and inspection by Qwest or its representatives, the representatives of permitting agencies, any right of way owner, and all city, county, or state inspectors. Construction Work rejected by any such inspections and representatives shall be corrected by Contractor and its Subcontractors at their sole cost, as expeditiously as possible, until such Construction Work passes the inspections.

16.    WARRANTY.

(a)     Contractor warrants that the materials and equipment furnished for Construction Work related to any Contract Order will be new and of recent manufacture unless otherwise specified, and that all Construction Work will be professionally performed, free from defects and faulty workmanship, and in conformance with the Contract Documents. Construction Work not conforming to these requirements, including substitutions not properly approved by Qwest, shall be rejected by Qwest.

(b)     Contractor shall promptly correct all Construction Work that is rejected by Qwest because of poor quality, defects, faulty workmanship, or other failure to conform with the Contract Documents. If within one year after the date of Final Completion, or longer period of time as may be prescribed by Law or by the terms of any specific warranty required by a Contract Order, any of the Construction Work is found to be of poor quality, defective, suffers from faulty workmanship, or otherwise not in conformance with the Contract Documents, Contractor shall correct, or begin to correct, such Construction Work within ten (10) Days after receipt of notice from Qwest. This obligation shall survive termination of this Master Agreement, any related Contract Order, and completion of the Construction Work.