Contractor's request for inspection, Qwest may inspect the Construction Work and shall either reject the Construction Work, identifying the defective or uncompleted portions, or shall issue to Contractor a written acknowledgment ("Notice of Final Completion").

(b) If Qwest rejects the Construction Work, and identifies the defective or uncompleted portions, Contractor shall within seven (7) Days, commence to remedy such defective or uncompleted portions of the Construction Work. Thereafter, Contractor shall request that Qwest perform a new inspection of the Construction Work, specifying the new date for completion of the Construction Work based on the date that the defective or uncompleted portions were corrected. The foregoing procedure will continue until Qwest issues a Notice of Final Completion to Contractor.

(c) Following Final Completion, Contractor may make a final request for payment ("Final Payment"). However, Final Completion as a condition precedent to Final Payment, will only occur when all of the following have been accomplished: (1) Substantial Completion; (2) Any required performance tests are completed to the satisfaction of Qwest; (3) All Punch List items have been completed to the satisfaction of Qwest; (4) All warranties and equipment documentation have been delivered to Qwest; (5) All lien waivers and affidavits have been delivered to Qwest; (6) All Applications for Payment have been submitted to Qwest's satisfaction; and, (7) Qwest has issued a Notice of Final Completion.

(d) Acceptance of Final Payment by Contractor, a Subcontractor or material supplier, shall constitute a waiver of all claims against Qwest by that payee. No payment made by Qwest shall be construed to be an acceptance on the part of Qwest of Construction Work not in conformance with the Contract Documents.

(e) Neither Final Payment nor any provision in this Master Agreement or Contract Order shall relieve Contractor of responsibility for defective Construction Work which appears within one year from the date of Final Completion. Contractor shall, at Contractor's expense, remedy any such defects and pay for all damages resulting therefrom.

**42. PARTIAL OCCUPANCY OR USE.**

(a) Qwest or separate contractors may occupy or use any completed or partially completed portion of the Construction Work associated with any Contract Order at any stage of completion. Such partial occupancy or use may commence whether or not the portion is certified as Substantially Complete.

(b) Immediately prior to such partial occupancy or use, Qwest and Contractor shall jointly inspect the area to be occupied or used in order to determine and record the condition of the Construction Work.

(c) Partial occupancy or use of a portion or portions of the Construction Work shall not constitute acceptance of Construction Work not complying with the requirements of the Contract Documents.

(d) Qwest shall assume responsibility for damage, utilities, safety and security for any portion of the job site it occupies for its intended use prior to Substantial Completion.

**43. ARBITRATION.**

(a) All claims, disputes and other matters in question between Contractor and Qwest arising out of, or relating to this Master Agreement, any Contract Order, the Project, the Design Services, the Construction Work, the Contract Documents or the breach thereof may, at Qwest's sole option, and only upon the exercise of that sole option by Qwest, together or separately as Qwest sees fit, be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining as modified hereby.

(b) Any arbitration arising out of or relating to this Master Agreement, the Contract Order, the Project, the Design Services, the Construction Work, the Contract Documents, or the breach thereof may include by consolidation, joinder or in any other manner, at Qwest's sole option, any other entities or persons whom Qwest believes to be substantially involved in a common question of fact or Law. If more than one claim, dispute, or other matter in question, shall be in existence at the same time, Qwest may at its sole option decide which of such claims, disputes or other matters in question shall be arbitrated and which shall not be arbitrated. Such decision shall be final and unappealable, and no arbitration shall be authorized to consider, decide, or make any award on any claim or matter which Qwest has determined shall not be arbitrated.

(c) In the event that Contractor wishes to request arbitration of any claim, dispute or other matter in question, Contractor shall file a notice of demand for arbitration in writing with Qwest specifically describing the claims, disputes and other matters in question which Contractor wishes to submit to arbitration. Contractor may not unilaterally elect arbitration or cause arbitration to occur. Qwest has the sole discretion to decide whether or not any such claims, disputes, and other matters shall be submitted for arbitration. If Qwest wishes to submit any claim, dispute or other matter in question, whether or not it is the subject of a request for arbitration by Contractor, Qwest shall file a notice of demand for arbitration with the American Arbitration Association and with Contractor.

(d) Qwest shall have the right, but not the obligation, by so electing in its arbitration demand, to invoke the following method of selection of arbitrators in lieu of that otherwise provided by the American Arbitration Association rules. If Qwest so elects in its notice of demand for arbitration, Qwest may appoint one (1) arbitrator in its notice of demand for arbitration. If Qwest does so, Contractor may, within ten (10) Days, appoint a second arbitrator. These two (2) arbitrators shall, within thirty (30) Days, or such further time as may be agreed upon between Qwest and Contractor, appoint a third arbitrator. If the two (2) arbitrators fail to appoint a third arbitrator, the third arbitrator shall be appointed in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association.

(e) Qwest may elect, in its notice of demand for arbitration, to have the discovery rights and procedures provided by the Federal Rules of Civil Procedure or Colorado Rules of Civil Procedure to be available and enforceable within the arbitration proceeding. The Parties shall be entitled to the full scope of and procedure for discovery, as defined by the broadest of the Federal or Colorado Rules of Civil Procedure. The arbitrators shall have the full powers and functions of a federal district judge with respect to such discovery to the extent permitted by law. In addition, the Parties may apply to any court or courts of competent jurisdiction in the aid of and in enforcement of such rights of discovery.

(f) In any case in which Qwest elects to submit a claim, dispute, or other matter in question to arbitration as provided herein, Qwest shall, in its sole discretion, select the location for the arbitration. Any request or demand for arbitration hereunder shall be made before the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

(g) This agreement to arbitrate shall be specifically enforceable by Qwest under the prevailing arbitration Law. Any award rendered by arbitrators shall be final and enforceable by any Party to the arbitration, and judgment may be rendered upon it in accordance with applicable Law in any court having jurisdiction thereof. The prevailing Party shall be entitled to recover its reasonable attorneys fees and all expenses arising out of the arbitration process.

(h) Contractor and Qwest mutually agree to arbitrate under the terms and conditions outlined in this Paragraph. Notwithstanding Qwest's right and discretion not to do so, Qwest shall arbitrate, after Final Completion of the Construction Work, any claims which Contractor selects which total, in the aggregate, up to five thousand dollars ($5,000). Qwest's obligation to arbitrate such claims totaling up to five thousand dollars ($5,000) shall be specifically enforceable by Contractor under the prevailing arbitration Law and any award rendered by the arbitrator(s) shall be final and enforceable by any Party to the arbitration, and judgment may be rendered upon it in accordance with applicable Law in any court having jurisdiction thereof.

(i) Unless otherwise agreed in writing, and notwithstanding any other rights or obligations of either of the Parties under the Contract Documents, Contractor shall carry on with the performance of its services and duties hereunder during the pendency of any claim, dispute, other matter in question or arbitration or other proceeding to resolve any claim, dispute or other matter in question, and Qwest shall continue to make payments in accordance with the Contract Documents, but Qwest shall be under no obligation to make payments on or against such claims, disputes, or other matters in question, during the pendency of any arbitration or other proceeding to resolve such claims, disputes or other matters in question.

**44.** **TERM**. The term of this Master Agreement shall be coextensive with each subsequently executed Contract Order entered into pursuant to this Master Agreement. Either Party to the Master Agreement may terminate the Master Agreement by notice to the other if no Design Services or Construction Work remains uncompleted pursuant to a previously executed Contract Order. However, each

Party's obligations in the Master Agreement or any Contract Orders shall survive such termination.

45. **ENTIRE AGREEMENT; AMENDMENTS**. This Master Agreement and related Contract Orders embody the entire agreement between the Parties hereto with respect to the subject matter and supersedes all prior and contemporaneous agreements and understandings, oral and written, with respect thereto. This Master Agreement and any related Contract Orders may be amended only by a written instrument signed by the Party against whom any waiver, change, amendment, modification or discharge may be sought.

46. **GOVERNING LAW**. This Master Agreement and related Contract Orders shall be governed by and construed in accordance with Laws of the State of Colorado, without regard to the conflict of Laws principles of Colorado.

47. **SEPARABILITY**. Any term or provision of this Master Agreement or related Contract Orders which are found by any court or arbitrator to be invalid or unenforceable will be ineffective only to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Master Agreement or any related Contract Order.

48. **WAIVERS**. No failure or delay on the part of either Party to this Master Agreement and related Contract Orders in exercising any power, right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.

49. **REFERENCES TO PARAGRAPHS OR SUBPARAGRAPHS, EXHIBITS, AND CONTRACT ORDERS**. All references in this Master Agreement or Contract Orders to a Paragraph or Subparagraph are to the Paragraphs or Subparagraphs of this Master Agreement or subsequently executed Contract Orders. All references in this Master Agreement to an exhibit, or Contract Order are to the exhibits, and Contract Orders incorporated herein by such reference.

50. **COUNTERPARTS**. This Master Agreement may be executed in any number of counterparts which, taken together, shall be but one and the same instrument.

51. **HEADINGS**. The headings in this Master Agreement are for purposes of reference only and shall not limit, enlarge or otherwise affect any term or provision of this Master Agreement.

52. **AGREEMENT NOT CONSTRUED AGAINST DRAFTSMAN**. The Parties and their respective counsel have reviewed this Master Agreement in its entirety and acknowledge that each has had a full opportunity to negotiate the terms of this Master Agreement. Therefore, the Parties waive any and all applicable common Law and statutory rules of construction that any provision of this Master Agreement should be construed against the drafter of the Master Agreement. The Master Agreement and all provisions thereof, including related Contract Orders, shall in all cases be construed as a whole, according to the fair meaning of the language used.

**53. ASSIGNMENT.** Subject to the limitations on Contractor's right to assign in this Paragraph, this Master Agreement shall be binding upon and inure to the benefit of the Parties hereto, their respective successors and assigns. Qwest may, without Contractor's consent, assign this Master Agreement and any subsequently executed Contract Orders. Contractor may not assign this Master Agreement or any subsequently executed Contract Order(s) without the consent of Qwest.

**54. COMPLIANCE WITH LAWS.** Contractor shall comply, during the term of this Master Agreement and related Contract Order and at Contractor's expense, with all applicable provisions of workers' compensation laws, unemployment compensation laws, the Federal Social Security law, the Fair Labor Standards Act, and all other Federal, State and local laws and regulations which may be applicable to Contractor as an employer of labor.

**55. IMMIGRATION.** During the term of this Master Agreement and related Contract Order, Contractor shall comply with hiring verification requirements, recordkeeping requirements and nondiscrimination provisions imposed by the Federal Immigration law insofar as they relate to Contractor's employees. Contractor shall indemnify, defend, and hold Qwest harmless from any penalties or other charges which may be levied or assessed as a result of Contractor's failure to comply with said Act.

**56. NONDISCRIMINATION.** Unless exempt under the rules and regulations of the Secretary of Labor or other proper authority, this Master Agreement and related Contract Order is subject to applicable Laws and executive orders relating to equal opportunity and nondiscrimination in employment. The Parties hereto shall not discriminate in their employment practices against any person by reason of race, religion, color, sex, national origin, or other category protected by federal, state, or local Laws, and agree to comply with the provisions of said Laws and orders, as well as all Laws and orders relating to the employment of the disabled, the employment of veterans and the use of the minority and women's business enterprises, to the extent any such Laws or orders are applicable in the performance of Work or furnishing of services, materials, equipment or supplies hereunder. For this purpose, the provisions of such Laws and orders and pertinent regulations issued thereunder, as now in force or hereafter amended, shall be deemed an integral part of this Master Agreement and related Contract Orders to the same extent that is written at length herein.

**57. LABOR RELATIONS.** Contractor shall be responsible for labor relations with labor organizations either representing or seeking to represent Contractor's employees and Contractor shall negotiate and seek to adjust all disputes between Contractor and Contractor's employees or the union representing Contractor's employees. In the performance of duties contemplated by this Master Agreement, Contractor may enter into any contract with any union representing Contractor's employees; provided, however, that Contractor shall enter into no contract that purports to obligate Qwest to the union, either as successor or assignee of Contractor or in any other way or at any time. Contractor warrants that it is not a Party to any existing union contract that purports to obligate Qwest.

**58. PROHIBITED RELATIONSHIPS AND GRATUITIES.** Each Party represents and warrants that no officer, employee, or agent of the other Party has been or will be employed, retained, paid a fee or otherwise receive personal compensation or consideration of any kind from that Party's employees or agents in connection with the obtaining, arranging, or negotiating this Master Agreement or Contract Order. Exchanging or offering of any gift, personal service, or unusual hospitality ("Gratuities") by one Party of this Master Agreement to the other is expressly prohibited. This prohibition is equally applicable to either Party's officers, employees, agents, or immediate family members. Either Party may, by notice, terminate the right of the other to proceed with any request for proposal if it is found that Gratuities are offered or have been given in connection with this execution of this Master Agreement, or Contract Order, or RFP.

**59. NO CONTRACTUAL RELATIONSHIP.** Nothing contained in this Master Agreement or any Contract Order shall create a contractual relationship between Qwest and any third party; however, Qwest shall be an intended third party beneficiary of all contracts for design and engineering services, all subcontracts of every tier, purchase orders, and other agreements between Contractor and third parties. Contractor shall incorporate the obligations of this Master Agreement and any Contract Orders into its respective subcontracts, supply agreements and purchase orders.

**60. CONFIDENTIALITY.**

(a) It is recognized that each Party to this Master Agreement and Contract Orders will obtain information concerning the other Party's operations which such other Party has maintained as confidential or proprietary information and has identified it as such in writing, and each Party will hold such information concerning the other in strict confidence.

(b) Neither Party shall disclose the contents of such confidential information to any third parties, except as may be required for performance of the Design Services or Construction Work or the Parties may make disclosure to those required for the implementation of this Master Agreement or Contract Order, and to customers and prospective customers, purchasers and prospective purchasers, auditors, attorneys, financial advisors, lenders and prospective lenders, investors and prospective investors, provided that in each case the recipient agrees in writing to be bound by the confidentiality provisions set forth in this Paragraph. In addition, either Party may make disclosure as required by a court order or as otherwise required by Law or in any legal or arbitration proceeding relating to this Master Agreement or Contract Order. If either Party is required by Law or by interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process to disclose information referred to in this Paragraph, it will provide the other Party with prompt prior notice of such request or requirement so that such Party may seek an appropriate protective order and/or waive compliance with this Paragraph. The Party whose consent to disclose information is requested shall respond to such request within five (5) Business Days of the request by either authorizing the disclosure or advising of its election to seek a protective order, or if such Party fails to respond

within the prescribed period the disclosure shall be deemed approved. This obligation relevant to confidentiality shall not apply to information that:

(i) Is or becomes part of the public knowledge or literature through no fault of such Party or its affiliates, agents, employees and contractors;

(ii) Was known to a Party prior to the other Party's first disclosure thereof to;

(iii) Is received by any Party without confidentiality obligations from a third Party that has a right to make such a disclosure; or

(iv) Is received by such Party more than five (5) years prior to the execution of a Contract Order.

(c) When required by Law, either Party may disclose such proprietary information; provided, however, that prior to making any such disclosure such Party shall:

(i) Provide the non-disclosing Party with timely notice of the proprietary information requested by any governmental entity and the receiving Party's intent to so disclose;

(ii) Minimize the amount of proprietary information to be provided commensurate with the interest of the disclosing Parties and requirements of the governmental entity involved; and

(iii) Make every reasonable effort (which shall include participation with the non-disclosing Party and discussions with the governmental entity involved) to secure confidential treatment and minimization of the proprietary information to be provided. If efforts to secure confidential treatment are unsuccessful, the originally disclosing Party shall be given a reasonable opportunity to revise such information to minimize a disclosure of such information in a manner commensurate with its interests and the requirements of the governmental entity involved.

**61. USE OF QWEST'S NAME.** Contractor will submit to Qwest all advertising, sales promotions and other publicity matters relating to the Work wherein Qwest's name is mentioned or language is used from which a connection of Qwest's name therein may, in Qwest's judgment, be inferred or implied; and Contractor shall neither publish or use such advertising, sales promotion, or publicity matter nor use Qwest's name as a reference without the prior consent of Qwest. This provision shall appear in any and all of Contractor's Subcontracts.

EFFECTIVE as of the Effective Date.

| QWEST COMMUNICATIONS CORPORATION | CONTRACTOR: BUILDERS GROUP |
|---|---|
| By: ______________ | By: ______________ |
| Name: August B. Turturro | Name: George Figliolia |
| Title: Senior Vice President | Title: President |
| Date of Signature: ______________ | Date of Signature: ______________ |

DENVER:0832250.11

# GLOSSARY OF TERMS

**BUSINESS DAY shall mean any calendar day other than a Saturday, Sunday, or any other calendar day on which commercial banks are authorized or required to close in Denver, Colorado.**

**CHANGE ORDER** shall mean a written order to Contractor pursuant to Paragraph 23 hereof, signed by Qwest and Contractor authorizing an addition, deletion, or revision in the Design Services or Construction Work, the Contract Time, or any change to the Guaranteed Maximum Price resulting therefrom.

**CONTRACT DOCUMENTS** shall mean the documents, including written modifications thereto, as defined in Paragraph 4.

**CONTRACT ORDER** shall mean a Contract Document executed subsequent to the Master Agreement that delineates the Design Services in Part 1 and the Construction Work in Part 2, and conditions that apply thereto on a Project.

**CONTRACT TIME** shall mean that period of time allotted in the Contract Order for Substantial Completion of the Construction Work.

**CONTRACTOR'S FEE** shall have the meaning stipulated in Paragraph 19.

**CONSTRUCTION SCHEDULE** shall mean the projected schedule for the performance of the Construction Work on the relevant Contract Order.

**CONSTRUCTION WORK** means the total construction, and services required or inferable from the Contract Documents, whether completed or partially completed, and includes all labor, materials, equipment, supervision, or services, provided or to be provided by Contractor, its Subcontractors, vendors, or suppliers, to fulfill Contractor's obligations. The Construction Work may constitute the whole or part of a Project.

**COST OF THE DESIGN SERVICES** shall mean the lump sum fixed price cost to Qwest of Contractor's complete performance of the Design Services.

**COST OF THE CONSTRUCTION WORK** shall have the meaning described in Paragraph 18.

**DAY** shall mean a calendar day and shall include Saturdays, Sundays, and holidays, except that, in the event that an obligation to be performed under the Contract Documents falls due on a day that is not a Business Day, the obligation shall be deemed due on the next Business Day thereafter.

**DESIGN SERVICES** shall mean the provision of all labor, materials, supervision, and professional services necessary to produce Specifications and Drawings of such quality and in such detail as appropriate for the Construction Work to be performed

on the Project. Design Services, at a minimum shall include the provision of Drawings and Specifications and estimates of the Cost of the Construction Work, Contract Time, and a Construction Schedule.

**DRAWINGS** means the graphic and pictorial portions of the Contract Documents, wherever located and wherever issued, showing the design, location, and dimensions of the Construction Work, generally including plans, elevations, sections, details, schedules, and diagrams.

**FINAL COMPLETION** shall have the meaning defined in Paragraph 41(c).

**GUARANTEED MAXIMUM PRICE (GMP)** shall have the meaning defined in Paragraph 18.

**LAW** shall mean any act, decree, rule, law, ordinance, legislation, statute, directive, regulation, notification, injunction, writ, policy, bylaw, administrative guideline, ruling, instruction, treaty, judgment or order of a court or any interpretation thereof enacted, issued, or promulgated by any governmental entity and applicable to the Project, the Design Services, and Construction Work, Qwest, Contractor or any of its Design Subcontractors or Subcontractors, as the case may be.

**LIQUIDATED DAMAGES** shall mean the sums which Contractor will pay Qwest as damages if it fails to meet its obligations pursuant to Paragraph 27 and the relevant Contract Order.

**PARTY OR PARTIES** shall mean Qwest or Contractor or both, as the context may require.

**PROJECT** is the total Design Services and Construction Work performed pursuant to the Contract Documents by Contractor and may be the whole or part, and which may also include design or construction by Qwest or by separate contractors.

**PUNCH LIST** shall mean the list prepared, periodically revised as necessary, by Qwest, with the full cooperation of Contractor, which list shall set forth certain Construction Work that remains to be performed to ensure that all of the Construction Work complies with all the standards and requirements of the Contract Documents.

**QWEST'S REPRESENTATIVE** shall mean a person identified in each Contract Order having the responsibility and authority described in Paragraph 14.

**REQUEST FOR PROPOSAL (RFP)** shall mean a written document promulgated by Qwest that requests a proposal from Contractor pursuant to this Master Agreement and a Contract Order. The RFP may include, among other things: a description of the Design Services and Construction Work to be performed; the location of the Project; the Contract Time; the identity of Qwest's Representative; Qwest's estimate of the Cost of the Design Services and Cost of the Construction Work; and, the rate of Liquidated Damages, if any.

**SPECIFICATIONS**  means that portion of the Contract Documents consisting of the written requirements for materials, equipment, construction systems, standards, and workmanship for the Construction Work, and performance of related services.

**SUBCONTRACTOR**  shall have the meaning defined in Paragraph 12.

**SUBSTANTIAL COMPLETION**  shall have the meaning defined in Paragraph 40(a).

# EXHIBIT 2

**DANIEL GAMMERMAN**
**ATTORNEY AT LAW**
**6800 Jericho Turnpike, Suite 110W**
**Syosset, New York 11791**
**PHONE: (516) 921-5600**
**FACSIMILE: (516) 921-5666**

---

Date: January 6, 2006

**MESSAGE TO:**

Name(s): Martin Steinberg, Esq.

Facsimile: (303) 383-8584

Telephone: ( )

**MESSAGE FROM:**

Daniel Gammerman

(516) 921-5666

(516) 921-5600

Total number of pages sent (including this cover sheet): (13)
PLEASE CHECK TRANSMISSION AFTER THE LAST PAGE IS RECEIVED. IF YOU DID NOT RECEIVE THE NUMBER OF PAGES SHOWN ABOVE, OR IF ANY COPIES ARE ILLEGIBLE, PLEASE CALL (516) 921-5600.

---

The information contained in this facsimile message is intended for the use of the individual or entity named above and my contain information that is privileged, confidential or otherwise protected from disclosure. If the reader of this message is not the intended recipient or is the employee or agent responsible for delivering it to the intended recipient, the reader is hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received a copy of this message in error, please notify me by telephone immediately and return the original message to me at the above address via the U.S. Postal Service. Thank you.

---

Message (if any) or Special Instructions:

ATTACHED ARE THE DOCUMENTS DESCRIBED IN MY EMAIL TO YOU OF THIS MORNING. THANK YOU.

Dear Mr. Steinberg:

This will confirm our conversation yesterday in which, at your request, I agreed to adjourn the deposition (pursuant to Subpoena) of Qwest Communications Corp. ("Qwest") noticed for January 10, 2006 based on your representation that the appropriate Qwest representative would supply the requested documents (to be limited as we agree to those pertaining to the claims of Builders Group as identified in the documents described below) and appear for a telephonic deposition no later than January 18, 2006 (as my deposition of Builders Group will take place on January 20, 2006).

Pursuant to our discussions yesterday, I am faxing to you 12 pages (plus the fax cover sheet) of documents that were provided to me by Builders Group with respect to its claim that there is an outstanding balance due from Qwest.   These documents will be faxed to you in the following order.  They are:

1.   an email from Steve Townsley (at Qwest) to James Maniscalco (at Builders Group) dated November 28, 2001, which refers to COR's 6, 7, 9 and 11 on BGT project #00-322,

2.   Change Order Request No. 00-322-00006, dated January 24, 2001,

3.   Change Order Request No. 00-322-00007 dated March 16, 2001,

4.   Change Order Request No. 00-322-00009, dated March 19, 2001,

5.   Change Order Request No. 00-322-000011 dated March 8, 2001,

6.   a letter from Builders Group to Qwest dated September 15, 2003 listing four (4) contracts and seeking a balance due of $74,174.10,

7.   a letter from Builders Group to Qwest dated August 13, 2004 listing three (3) invoices, as follows: (i) invoice no. 0032230006 dated February 6, 2002 in the amount of $80,752.91, (ii) invoice no. 0032240002 dated February 4, 2002 in the amount of $21,237.44, and (iii) invoice no. 003224003 dated February 5, 2002 in the amount of $3,780.68. These invoices total $105,771.03 against which a payment or credit on February 4, 1999 in the amount of $2,608.46 was applied leaving a alleged balance of $103,162.57 plus finance changes.

8.   a letter from Builders Group to Qwest dated September 9, 2005 listing the same three (3) invoices as in the prior letter but not applying the February 4, 1999 payment or credit, and seeking a balance of $105,771.03 plus finance charges,

9.   two (2) pages of emails from Builders Group to Qwest from May 18, 2005 to September 13, 2005 seeking payment?,

10.   a two (2) page Builders Group Summary Report dated September 22, 2005 purportedly seeking (i) $80,752.91 with respect to no. 0032203, and (ii) $25,018.12 with respect to no. 00-32204 (note that $21,234.44 and $3,780.68 equal $25,018.12).  These numbers total $105,771.03.  Although there is a reference to a $4,433.11- adjustment on 00-32201, that adjustment does not seem to have been factored into an alleged balance claimed due.  Again, there is no reference on this document to the payment or credit of $2,608.46 shown on the August 13, 2004 letter.

From the documents that have been provided to me the contract number may be 008349 and the project number may be  20132.15956.33019; 008349. On some documents a contract order number of 010117 appears. The contracts coordinator was Sally Broughton; the Contract Manager was Robert O'Leary; the

contract was approved by Thomas T. Reilly (Director, Contracts & Procurement); and Eric Bradford; Monica Douglas (Assistant Contracts Coordinator), and Stephen Bishop appear to have been involved in the approval of change orders.

Please let me know when you will have the relevant documents available. If you have any questions, please feel free to contact me. Thank you for your assistance.

Dan

# EXHIBIT 3



BUILDERS GROUP
Executive Summary Organization & Staffing Our Project Team

Home
Our Group
Portfolio
Qualifications
Clients
Job Openings
Contact
Operations
Virtual Tours

# Our Group

Builders Group is a privately held corporation, established to meet our clients' needs. As a special services company we enjoy continuing business with our clients; providing them a close working relationship and a high level of quality, integrity and competitiveness.

Since its organization in 1986, Builders Group has delivered a hands-on approach to a select group of clients. Our select client base does continue to broaden. Our people and their reputation are our sales force and their efforts can be measured by our consistent growth.

Builders Group has been delivering its products and construction services to the corporate community since its inception. These clients include: AT&T, Tiffany & Co., St. Vincent's Hospital, Merrill Lynch, Deutsche Bank and the Bank of New York.

Initially working on projects in New York City, Long Island and New Jersey we have expanded beyond this region to working throughout the country, now licensed throughout the United States. Dedication and versatility have afforded us these opportunities.

Home - Our Group - Portfolio - Qualifications - Clients - Job Openings - Contact

© 2007 Builders Group

# BUILDERS GROUP

Home
Our Group
Portfolio
Qualifications
Clients
Job Openings
Contact
Operations
Virtual Tours

## Welcome To BUILDERSGROUP.com

Builders Group, an industry leader in construction services, offers several distinct divisions providing specialists in new construction, commercial office interiors, healthcare, residential, retail, technology and telecommunications. Our veteran staff provides the same expertise and service whether Builders Group is engaged as Construction Manager, General Contractor, Design Builder or Consultant.

Our comprehensive services provide project enhancement from lease review and work letter analysis, to project scheduling and monitoring, as well as long term maintenance of completed assignments. As builders we provide strict attention to schedule constraints and budget. We offer competitive pricing and our tireless staff is known in the industry as aggressive and detail oriented. We are a 24 x 7 Service Company always poised to respond to our clients' needs.

Thank you for visiting us and please feel free to contact us with any comments or questions.

Home - Our Group - Portfolio - Qualifications - Clients - Job Openings - Contact

© 2007 Builders Group

# EXHIBIT 4

CONTRACTOR'S
FINAL AFFIDAVIT, RELEASE AND LIEN WAIVER

This Final Affidavit, Release And Lien Waiver is entered into with reference to that certain construction contract between the undersigned Contractor and Qwest Communications Corporation for construction related to installation of a telecommunications conduit system.

From: **Builders Group Technologies** (the "Contractor").

To: Qwest Communications Corporation (the "Owner"),

Project: **00-322 – Electrical Work** (the "Project").

Location of the Project: **60 Hudson Street New York, NY**.

Construction Contract: **8349** (the "Contract").

The undersigned, being first duly sworn, deposes and says that:

1. Contractor is the contractor for the performance of certain work and the furnishing of certain materials or supplies pursuant to the Contract.

2. This instrument is delivered in consideration of and for the purpose of inducing Owner to make final payment of $ **162,827.09**, and is subject only to collection of any check given as payment. Contractor acknowledges that upon receipt of this final payment, Contractor has been paid for all of the work performed under the Contract (which includes all labor and materials furnished by or through Contractor for, on or to the Project).

3. Contractor for itself, its successors, and on behalf of all persons able to claim through or under Contractor: (a) waives, relinquishes and releases all liens and right or claim to a lien for labor or materials furnished in the construction, improvement, alteration or repair involved in performance under the Contract; (b) agrees to save Owner harmless from all liability, costs and expenses, including reasonable attorneys' fees, to: (1) discharge (by bond or otherwise) or to defend suit to enforce, any mechanics' or materialmen's lien, claim to or right of action for such lien, which may be filed as a result of or in connection with any work performed at or materials furnished to the Project by, through or under Contractor or the Contract through the date hereof; and (2) satisfy any claims or demands arising out of, due or which may be made, directly or indirectly attributable to the Contract, any work performed or supplies furnished thereunder, or in furtherance of the construction or completion of the Contract work; and (c) hereby releases the present and any future Owner, the Project and any lender who may now or hereafter have a security interest therein, from all claim, right or action, liability and lien which might accrue under the laws of the State in which the Project is located in connection with the Contract or any labor or materials furnished by or through Contractor for, on or to the Project through the date hereof.

4. Contractor warrants and represents: (a) all materials delivered to the Project by or for Contractor are for use therein only; (b) title to all work, material and equipment covered by such payment, whether or not incorporated in the Project, has passed to the Owner, free and clear of all liens and claims (including, without limitation, mechanics' or materialmen's liens and claims), security

JAN 18 2006 12:20 FR TO 813033911859 P.05/09
AUG.26.2003 11:08AM NYC BUILDERS GROUP

interests or encumbrances (hereinafter all referred to as "liens"); (c) all taxes applicable to the materials furnished and the work performed under the Contract have been fully paid; and (d) all laborers, mechanics, subcontractors, materialmen and suppliers for all work done and for all materials, machinery, equipment, fixtures, tools, scaffolding and appliances furnished for the performance of the Contract and for any other indebtedness connected therewith for which the Owner might be responsible have been paid in full.

5. It is acknowledged that the designation of the above Project constitutes an adequate description of the property and improvements for which the undersigned has received consideration for this instrument.

6. The undersigned individual warrants and represents that he is duly authorized and empowered to sign and execute this instrument on behalf of the Contractor for which he is signing.

Dated this 26th day of August, 2003

CONTRACTOR:
**Builders Group Technologies**

By: [signature]
Name: Louis Figliolia III
Title: Assistant Project Manager

STATE OF New York )
) ss.
COUNTY OF New York )

The foregoing instrument was acknowledged before me this 26 day of August 2003 by Louis Figliolia III, as PM of Contractor.

WITNESS my hand and official seal.

My commission expires: July 6, 2006

Diana Cabranes
Notary Public

DIANA CABRANES
Notary Public, State of New York
No. 01CA6010008
Qualified in Richmond County
Commission Expires July 6, 2006

c:\documents and settings\lfigliolia\local settings\temporary internet files\olk1\lien_ful.doc Page 2 of 2

01/18/2006 9:55AM

# EXHIBIT 5

# EXHIBIT 6

**Pecoraro, Catherine**

| | |
|---|---|
| **From:** | Bachmeier, Bob [IMCEAEX-_O=QWEST_OU=DENVER_CN=RECIPIENTS_CN=BBAHMEIE@local] |
| **Sent:** | Friday, April 30, 2004 12:04 AM |
| **To:** | George Figliolia |
| **Cc:** | Barbara Annarumma |
| **Subject:** | RE: Builders Group Statement |

George,

I have reviewed the request for payment. I have discovered that the contract you were working on was a GMP contract in which you submitted your final payment with the final lien release. There will be no further payments made to Builders Group on these contracts.

Let me know if you have any questions.

Thanks,
Bob

-----Original Message-----
From: Barbara Annarumma [mailto:bschmid@BuildersGroup.com]
Sent: Tuesday, April 27, 2004 7:27 AM
To: Bachmeier, Bob
Cc: George Figliolia
Subject: Builders Group Statement

Dear Mr. Bachmeier,

Pursuant to your conversation w/George Figliolia yesterday,
I have attached the above-referenced document.

Your assistance in this matter is greatly appreciated.

<<_0427071637_001.pdf>>

Barbara Annarumma
BUILDERS GROUP
115 Broadway, 18th Floor
New York, New York 10006
Direct 212-981-2921
Fax 212-981-2924
www.buildersgroup.com

**Pecoraro, Catherine**

| | |
|---|---|
| **From:** | Bachmeier, Bob [IMCEAEX-_O=QWEST_OU=DENVER_CN=RECIPIENTS_CN=BBAHMEIE@local] |
| **Sent:** | Monday, July 12, 2004 11:14 AM |
| **To:** | George Figliolia |
| **Cc:** | Isaac Stareshefsky; Sandra Romero; Beck, Kevin; Kehoe, Sandra |
| **Subject:** | RE: Builders Group Statement (Updated) |

George,

As I have stated previously we have reviewed our records and the information you have provided to us and have determined that this contract is closed and all dollars earned have been paid out.

Thanks,
Bob Bachmeier
CRE - Design & Construction
614-215-7716 office
614-215-7611 fax
614-404-0389 cell

-----Original Message-----
From: George Figliolia [mailto:gjfigliolia@BuildersGroup.com]
Sent: Thursday, July 08, 2004 11:08 AM
To: Bachmeier, Bob
Cc: Isaac Stareshefsky; Sandra Romero
Subject: RE: Builders Group Statement (Updated)

Bob , when can we spend some time on this ?

> -----Original Message-----
> From: Barbara Annarumma
> Sent: Tuesday, May 18, 2004 2:56 PM
> To: 'bob.bachmeier@qwest.com'
> Cc: George Figliolia; Isaac Stareshefsky; Sandra Romero
> Subject: Builders Group Statement (Updated)
>
> Please see the attached document from George Figliolia.
> Your assistance in this matter is greatly appreciated.
>
> << File: _0518145304_001.pdf >>
>
> Barbara Annarumma
> BUILDERS GROUP
> 115 Broadway, 18th Floor
> New York, New York 10006
> Direct 212-981-2921
> Fax 212-981-2924
> www.buildersgroup.com